Case 1:01-cv-03014-GBD   Document 1   Filed 04/10/01   Page 1 of 19

DOC #

Ralph M. Stone (RS-4488)
Kenneth A. Ricken (KR-0217)
SHALOV STONE & BONNER
276 Fifth Avenue, Suite 704
New York, New York 10001
(212) 686-8004
Fax (212) 686-8005

Robert P. Sugarman (RS-8001)
LAW OFFICES OF ROBERT P. SUGARMAN
50 Charles Lindbergh Blvd., Suite 400
Uniondale, New York 11553
(516) 390-4748

01 CV 3014

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
SANFORD GOULD, Individually And On Behalf : No.
Of All Others Similarly Situated,
 :
       Plaintiff, :
 :
    vs. : CLASS ACTION COMPLAINT
 :
WINSTAR COMMUNICATIONS, INC.; :
WILLIAM J. ROUHANA, JR.; RICHARD J. :
UHL; and NATHAN KANTOR, :
 : JURY TRIAL DEMANDED
       Defendants. :
---------------------------------------------------------- x

       Plaintiff, for his class action complaint (the "Complaint"), alleges upon the investigation conducted by and through his undersigned attorneys, except as to those paragraphs relating to the plaintiff, his purchases of the common stock of Winstar Communications, Inc. and his suitability to serve as a class representative, which are alleged upon personal knowledge, the following:

### *JURISDICTION AND VENUE*

       1.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa.

2. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5.

3. Venue is proper in this district pursuant to, among others, Section 27 of the Exchange Act because defendant Winstar maintains executive offices in this district, and many of the alleged acts, transactions, and conduct constituting violations of law, including the preparation, issuance, and dissemination to the investing public of materially false and misleading information, occurred, at least in part, in this district.

4. In connection with the acts alleged in this Complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of the national securities exchanges.

## *THE PARTIES*

### A. *Plaintiff*

5. Plaintiff Sanford Gould purchased shares of Winstar common stock during the Class Period as set forth in his attached certification, and has been damaged thereby.

### B. *Defendants*

6. Defendant Winstar Telecommunications Limited ("Winstar" or the "Company") is a Delaware corporation with its principal executive offices located at 685 Third Avenue, New York, New York. Winstar is a broadband services company. The company purports to be rapidly building one of the world's most widely available, end-to-end broadband networks. Winstar claims to make this network important and useful to businesses by providing a set of broadband services. These services include high-speed Internet and data, Web hosting and design, phone services, Web-based applications, e-commerce, professional services and Office.com(R), A Service From Winstar, an online business service for small and medium-sized businesses.

7. Defendant William J. Rouhana, Jr. ("Rouhana") was, at all relevant times herein, Chief Executive Officer and Chairman of the Board of Directors of the Company. By virtue of his role as an officer and director of the Company, and by virtue of his role as the primary voice

of the Company in all press releases and interviews; Rouhana is a control person of the Company as that term is construed by the federal securities laws. Defendant Rouhana maintains his principal executive offices at 685 Third Avenue, New York, New York.

8. Defendant Richard J. Uhl ("Uhl") was, at all relevant times herein, Chief Financial Officer of the Company.

9. Defendant Nathan Kantor ("Kantor") was, at all relevant times herein, President and Chief Operating Officer of the Company.

10. By reason of their direct and substantial management positions and responsibilities during the time relevant to this Complaint, defendants Rouhana, Kantor and Uhl were each "control persons" of Winstar within the meaning of Section 20 of the Exchange Act, and had the power and influence to control Winstar, and exercised that control to cause the Company to engage in the violations and improper practices complained of herein. Defendant Rouhana, Kantor and Uhl had access to adverse non-public information about the Company's operations, and acted to conceal and misrepresent such material information in violation of their duties and responsibilities under the federal securities laws.

11. It is appropriate to presume that the false, misleading and incomplete information conveyed in the Company's press releases, public statements and other publications as alleged herein are the actions of defendant Rouhana, Kantor and Uhl. Each of them directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its operations, as alleged herein. Defendants Rouhana and Kantor were the Company's primary spokespersons and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and each was aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Defendant Uhl prepared the Company's false and misleading financial statements, participated in

the drafting of the Company's financial releases, supervised and drafted material portions of the Company's SEC filings, and signed the SEC filings cited herein.

12. The statements made by the Defendants, as outlined below, were materially false and misleading when made. Defendants had no reasonable or adequate basis to justify or support their statements concerning Winstar's operating condition and future prospects. Defendants had, during the Class Period, direct knowledge of the Company's technical difficulties and the unrealistic deadlines set for a number of milestone events.

### *PLAINTIFF'S CLASS ACTION ALLEGATIONS*

13. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons and entities who purchased Winstar securities in the open market between August 2, 2000 and April 2, 2001, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors and assigns and any entity in which defendants have or had a controlling interest.

14. The Class is so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained from the records maintained by Winstar or its agents, as of November 9, 2000, there were 92,224,263 shares of Winstar common stock outstanding and held by what plaintiff believes to be thousands of shareholders of record throughout the United States.

15. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class purchased Winstar common stock during the Class Period and sustained damages arising out of Defendants' wrongful conduct in violation of federal securities laws as alleged herein.

16. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in class action and securities

4

litigation and plaintiff has no interests antagonistic to or in conflict with the other members of the Class.

17. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. The likelihood of individual Class members prosecuting separate claims is remote since the damages suffered by individual Class members may be relatively small and the expense and burden of individual litigation makes it impossible for Class members individually to seek redress for the wrongs done to them. Thus, it is desirable for all concerned to concentrate this litigation in this particular forum. No unusual difficulties are likely to be encountered in the management of this class action.

18. There are questions of law and fact common to the members of the Class which predominate over any questions affecting only individual members. These common questions of law and fact include, among others:

    a. whether Defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5;

    b. whether Defendants participated in the common course of conduct complained of herein;

    c. whether documents, releases, reports, and statements disseminated to the investing public during the Class Period omitted to state or misrepresented material facts about the Company's financial condition and operations;

    d. whether Defendants acted with knowledge or with reckless disregard for the truth in omitting to state and/or misrepresenting material facts about the Company's revenues and operations;

    e. whether, during the Class Period, the market prices of Winstar common stock were artificially inflated due to the non-disclosures and/or material misrepresentations complained of herein; and

    f. whether the members of the Class have sustained damages, and, if so, the proper measure thereof.

19. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    a. Defendants made public misrepresentations during the Class Period, as alleged in this Complaint;

    b. the misrepresentations were material;

    c. shares of Winstar were traded on a developed stock exchange, namely the NASDAQ National Market System, which is an efficient market within the meaning of that term in the context used in this Complaint; and

    d. plaintiff and the other members of the Class purchased their Winstar common stock between the time Defendants made the misrepresentations and the time the truth was fully revealed, without knowledge of the falsity of the misrepresentations.

20. Based upon the above, plaintiff and the Class are entitled to a presumption of reliance upon the integrity of the market for, at least, the purposes of class certification, as well as for ultimate proof of their claims on the merits. Similarly, plaintiff and the Class are entitled to a presumption of reliance established by the material omissions alleged in this Complaint.

### *NO SAFE HARBOR*

21. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint, because the specific statements pleaded herein were neither identified as "forward-looking statements" when made, nor accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements. To the extent that the statutory safe harbor applies to any of the statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of Winstar who knew that the statement was false or misleading.

## *SUBSTANTIVE ALLEGATIONS*

22.  The Class Period begins on August 2, 2000, the date on which the Company announced its financial results for the second quarter of fiscal year 2000. The company reported total revenue of $176.3 million for the quarter ended June 30, 2000, a purported 82.7% increase over the year-ago quarter. Winstar's reported broadband services revenue for the quarter was $152.8 million. According to the Company's press release, Winstar's "stronger than expected revenue performance was augmented by continued sharp improvement in gross margin, which rose to an all-time high of 44.1% in the second quarter" compared to claimed gross margins of 40.7% in the prior quarter, 24.0% in the year-ago quarter, and 10.5% as recently as six quarters ago. The press release stated that "[t]he company expects gross margins to continue to improve throughout the balance of the year" and that "[d]riven largely by strong revenue growth and higher margins, Winstar narrowed its EBITDA loss for the quarter to $44.8 million, a $38.3 million improvement from the year-ago quarter, and an $11.8 million sequential improvement from the prior quarter. This is the company's fourth consecutive quarter of strong improvement since posting its peak EBITDA loss in the second quarter of 1999." Winstar also reported total assets at June 30, 2000 of $4.18 billion. Commenting on these results, the Company's press release quotes defendant Rouhana as stating:

> Our strong growth continues to be driven by the emergence of a high-capacity broadband network that is both increasingly available to customers, and increasingly enriched by services that set it apart. As we made clear at our recent analyst meeting, our strategic focus is the continued expansion of both our network and our unique product set - and the execution of that strategy is apparent in our results. Continued execution will be even more important in the quarters ahead, as we ramp up for the high-growth stage of our development.

Similarly, defendant Kantor stated:

> Strong blocking and tackling, combined with solid overall execution, has enabled us to deliver another quarter of steadily improving financials. With both network expansion and product development on track, we continue to broaden and enrich the market for our sales force. Growing sales momentum has enabled us to again deliver strong revenue growth despite focusing sales and installation activity almost entirely on our own network. This

7

> disciplined approach resulted in on-net lines added during the quarter surging to an all-time high of 73%, contributing significantly to our increased margins and strong financial performance.

23. The foregoing press release was materially false and misleading for several reasons. First, defendants overstated the Company's assets (and thereby overstated its creditworthiness and ability to obtain financing). Winstar was capitalizing numerous capital expenditures as assets, rather than expensing them. In addition to misleadingly increasing assets, this practice materially overstated the Company's EBITDA. In addition, Winstar's financial statements overstated the Company's revenues by including uncollectible receivables as revenues. As a result, defendants falsely portrayed the Company as financially stable, growing and prosperous, when, in fact, the Company's financial condition was severely worse than it publicly represented.

24. The Company's misleading financial results were repeated in a Report on Form 10-Q filed with the SEC on or about August 14, 2000.

25. On November 8, 2000, the Company announced its financial results for the third quarter of fiscal 2000, the quarterly period ended September 30, 2000. The Company reported total revenue of $195.1 million for the quarter ended September 30, 2000, a 63.3% increase over the year-ago quarter. Winstar's broadband services revenue for the quarter rose to $175.9 million, up 80.2% from the prior year and up 15.1% from the previous quarter. The company has now delivered double-digit percentage increases in broadband services revenue for 14 consecutive quarters. Winstar's claimed "stronger than expected revenue performance was augmented by continued sharp improvement in gross margin, which rose to an all-time high of 47.3% in the third quarter" which compared to claimed gross margins of 44.1% in the prior quarter, 30.1% a year ago, and 10.5% seven quarters earlier. According to the Company's press release:

> The company expects gross margin to continue to improve throughout the balance of the year and beyond. Driven largely by strong revenue growth and margin improvement, Winstar narrowed

8

> its EBITDA loss for the quarter to $32.0 million, a $40.6 million improvement from the year-ago quarter, and a $12.8 million improvement from the prior quarter. This is the company's fifth consecutive quarter of strong improvement since posting its peak EBITDA loss in the second quarter of 1999.   Winstar expects its EBITDA losses to continue to decline until it reaches EBITDA breakeven, which is expected to occur during the first half of 2001. The company's $12.8 million improvement in EBITDA for the quarter was achieved despite a discretionary investment of approximately $6.5 million in sales and marketing initiatives. ... The company reported a net loss for the quarter applicable to common shareholders of $227.4 million, or $2.50 per share, $0.04 better than consensus analyst earnings expectations.

The press release quoted defendant Rouhana stating:

> Our strong growth and steadily improving performance are driven by discipline and execution. Implementation of our strategy to build a widely available broadband network and make it useful to customers has enabled us to deliver industry-leading on-net performance. Successful execution of these highly focused initiatives has dramatically improved our financial results over the last six quarters.

Likewise, the press release quoted defendant Kantor stating:

> Execution is driving our results - pure and simple. With both network expansion and product development on track or ahead of schedule, we continue to broaden and enrich the market for our sales force. The resulting sales momentum has enabled us to deliver strong revenue growth across all channels.

26.  The foregoing press release was materially false and misleading for several reasons. Defendants overstated the Company's assets (and thereby overstated its creditworthiness and ability to obtain financing). Winstar was capitalizing numerous capital expenditures as assets, rather than expensing them. In addition to misleadingly increasing assets, this practice overstated the Company's EBITDA. In addition, Winstar's financial statements overstated the Company's revenues by including uncollectible receivables as revenues. As a result, defendants falsely portrayed the Company as financially stable, growing, successful and prosperous, when, in fact, the Company's financial condition was severely worse than it publicly represented.

9

27.     The materially false and misleading financial statements described above were repeated in a Report on Form 10-Q filed with the SEC on or about November 14, 2000. In addition, this report stated that Winstar's "existing financial resources will be sufficient to fund our planned operations and capital requirements into the first quarter of 2002."

28.     Defendants thereafter engaged in a variety of discussions with analysts and others in which they repeatedly pronounced the Company's financial condition to be sound and declared that the Company would begin to be profitable in the first half of 2001, and that it was well capitalized and financed through 2002. For example, that same day, November 8, 2000, Dow Jones reported that, "Winstar executives said they remain 'comfortable' with prior guidance that the company's capital spending will total $2.2 billion for 2000 and 2001." The report also stated that Richard Uhl, the Company's Chief Financial Officer stated that the Company would be at "the high end" of revenue estimates of $700 million to $740 million in fiscal 2000, and a range of $900 million and roughly $1 billion in fiscal 2001. Dow Jones separately reported that defendant Rouhana stated that the Company had the "capital we need to get past the point we need to get to be EBITDA positive in the first half of next year and into the first part of 2002, and through the completion of (Winstar's) core network buildout."

29.     The next day, securities analyst Tom Friedland of Robertson Stephens issued a report on Winstar based on guidance from the Company and information obtained from defendants. Friedland reiterated a "Buy" recommendation to investors and, based on the clear guidance from defendants, stated "we believe it is now funded into the first quarter of 2002."

30.     The December 11, 2000 edition of *Forbes* magazine included an article about broadband companies, confirming that defendant Rouhana would be "cash flow positive" within six months. Similarly, the January 8, 2001 edition of *Business Week* magazine included an article on the telecommunications industry cited defendant Rouhana as saying that Winstar's data revenue is doubling every five months and will account for 60% of its total revenue of about $800 million in 2000."

10

31.     On February 27, 2001, the Company announced financial results for the fourth quarter and full year of fiscal 2000. The Company reported total revenue of $225.1 million for the quarter ended December 31, 2000, a claimed 59.1% increase over the year-ago quarter. Winstar's broadband services revenue for the quarter was reported to be $197.3 million, reportedly up 74.6% from the prior year and up 12.2% from the previous quarter. The Company's press release stated:

> Winstar's stronger than expected revenue performance was augmented by its eighth consecutive quarter of sharp improvement in gross margin. The company posted an all-time high gross margin of 50.3% for the quarter, as compared to 47.3% in the prior quarter, 35.4% a year ago, and 10.5% as recently as two years ago. The company expects execution of its on-net strategy to continue to drive gross margin improvement throughout 2001.
>
> The combination of strong revenue growth and margin improvement enabled Winstar to narrow its EBITDA loss for the quarter to $19.9 million, a $41.9 million improvement from the year-ago quarter, and a $12.0 million, or 37.7%, improvement from the prior quarter. This is the company's sixth consecutive quarter of significant improvement since posting its peak EBITDA loss in the second quarter of 1999. Winstar expects its EBITDA losses to continue to decline until it reaches EBITDA breakeven, which is expected to occur during the second quarter of 2001.
>
> The company reported a net loss for the quarter applicable to common shareholders of $255.1 million, or $2.76 per share, $0.02 better than consensus analyst earnings expectations. For the full year ended December 31, 2000 Winstar reported total revenue of $759.3 million, a 70.4% increase over 1999. Broadband services revenue increased to $659.5 million, up 85.2% from the prior year. EBITDA losses for the year were $153.4 million, down over 48% from $297.3 million in 1999.

According to the Company's press release, defendant Rouhana stated:

> Solid and sustained execution of our business strategy has enabled us to deliver another quarter of results that exceed consensus expectations. Our performance in two key areas has driven much of that success. First, consistent execution of our strategy to accelerate the build-out of our broadband network, while enhancing its value with a wide range of broadband services, continues to pay dividends. Second, the unprecedented success of our disciplined on-net strategy has resulted in sharply improved financial performance for eight consecutive quarters.

The Company's press release also quoted defendant Kantor stating:

11

> Execution is driving our results - pure and simple. With both network expansion and product development on track or ahead of schedule, we continue to broaden and enrich the market for our sales force. The resulting sales momentum has enabled us to deliver strong revenue growth across all channels. Given our goal of doubling our addressable market again in 2001, we clearly expect that momentum to continue.

32. Throughout March 2001, the price of Winstar stock declined in dramatic amounts as negative reports surfaced concerning the Company's aggressive accounting practices, which served to highlight that the Company's financial situation was far more precarious than the Company had previously indicated. In response, the Company remained largely silent and allowed certain of its proxies to disseminate confusing information suggesting that negative reports about the Company were untrue. The Company disseminated a memo to its employees in March 2001, signed by defendants Rouhana and Kantor, denying that the Company was in financial trouble. Defendant Rouhana also participated in a Merrill Lynch analyst conference on March 14, 2001 in New York City, in which he again reiterated the financial stability and growth trajectory of the Company. Based on this fraudulent presentation, Merrill Lynch reiterated its "Buy" rating on Winstar stock on March 20, 2001, in an internal note from Merrill analysts to its brokers.

33. Thereafter, on April 2, 2001, the Company disclosed that it would be filing its annual Report on Form 10-K late. The company stated ambiguously that it was involved in material transactions that precluded it from making a timely filing. On April 5, 2001, the Company announced that it was "halting" its expansion plans and laying off 2,000 of its workers (representing about 50% of its workforce).

34. The decline in the value of Winstar common stock has been extraordinary, with the shares closing at $0.40 per share on April 6, 2001. The stock declined from $2.16 per share on March 30, 2001 to close at $0.875 per share on April 2, 2001, on volume of more than 16 million shares. The stock closed at $12.50 per share on March 1, 2001, $17.56 per share on February 1, 2001, and had traded in the $20.00 range during much of the class period and as high

as $32.00 per share during the Class Period. Today, the stock is virtually worthless, and the Company that professed to be well-capitalized into 2002 is teetering on the brink of bankruptcy.

## COUNT I

### Violation Of § 10(b) Of The Exchange Act Against Defendants Winstar, Rouhana, Kantor and Uhl

35. Plaintiff repeats and realleges each and every allegation contained above.

36. This claim is brought against the Company and defendants Rouhana, Kantor and Uhl for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for perpetrating a fraud on the market for Winstar securities. As set forth above, each of the defendants is liable under these anti-fraud provisions of the federal securities laws for the various and numerous misleading public pronouncements of financial stability and growth and other claims concerning business plans and operations that falsely and misleadingly suggested that the Company was growing and was enjoying market success in line with previously announced expectations.

37. The defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of fraudulent conduct to artificially raise and maintain the artificially inflated market price of Winstar securities stock during the Class Period. These defendants employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein, which operated as a fraud and deceit upon the purchasers of Winstar securities during the Class Period.

38. At the time of the course of conduct alleged above, plaintiffs and the other members of the Class were ignorant of the facts alleged herein. Plaintiffs and the class members could not in the exercise of reasonable diligence have known the actual facts. In

13

reliance on the integrity of the market price of these securities, plaintiffs and other members of the Class were induced to and did purchase Winstar securities at artificially inflated prices. Had plaintiffs and other members of the Class known the truth, they would not have taken such action.

39. As set forth above, the defendants, with knowledge or in reckless disregard of the fraudulent nature of the conduct complained of herein, caused and permitted the actions which are alleged to have occurred. Defendants' scienter may also be readily inferred from the significant positions of defendants Rouhana, Kantor and Uhl and their regular and frequent appearances as the Company's primary spokespersons.

40. As alleged herein, defendants acted with scienter in that defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company or with defendants' imprimatur and approval were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially and culpably participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt or reckless disregard of information reflecting the true facts regarding Winstar, their control over, and/or receipt and/or modification of Winstar's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Winstar, participated in the fraudulent scheme alleged herein. In particular, among other things:

i. Defendants Rouhana, Kantor and Uhl are each sophisticated individuals who held senior executive, managerial or other relationships and positions with the Company which provided to them the access and ability to receive and obtain information concerning the numerous material problems outlined above which adversely impacted the Company's operations at all relevant times.

14

    ii.  A key management tool for Winstar's Board and top executives was Winstar's business plan, budget, forecast and/or yearly projections, by which Winstar's top executives set performance goals for Winstar and then closely monitored the Company's actual performance, i.e., results of operations, compared to the planned, budgeted and/or forecasted results on a continuing basis. These plans, forecasts and budgets were prepared at least annually, and were frequently updated during the year. Defendants were aware of Winstar's internal plan, forecast and budget and of the internal reports prepared and circulated monthly and quarterly comparing Winstar's actual results to those previously planned, budgeted and/or forecasted. Winstar's senior executives used the internal plan, budget and forecast as the basis for the statements they made publicly about Winstar's performance during the Class Period. Based on the negative internal reports of Winstar's actual business performance compared to that planned, budgeted and forecasted, defendants knew or recklessly disregarded at all relevant times that those public statements were false and misleading when made and were inflating the market price of Winstar common stock. The close temporal relationship between defendants' statements about its success and strong financial position and the ultimate disclosure that the Company was in desperate financial condition and needed to halt much of its operations further supports the strong inference of scienter and the intent to deceive the investing public.

    iii.  Throughout the Class Period, by virtue of their status as senior executives and directors of Winstar, defendants Rouhana, Kantor and Uhl and certain other key management personnel of the Company, held periodic meetings to discuss material aspects of the Company's continuing operations. At or prior to such meetings, defendants were able to and did receive the Company's internal plans, projections, budgets and forecasts as well as information and data conveying the Company's actual performance, i.e., results of operations, compared to the planned, budgeted and/or forecasted results on a continuing basis. Based on the negative internal reports of Winstar's actual business performance compared to that planned, budgeted and forecasted, defendants knew or recklessly disregarded that the Company's public statements were

15

false, misleading and lacking in reasonable basis when made and were inflating the market price of Winstar stock, at all relevant times.

    iv.  Scienter may also be inferred from several transactions accomplished during the Class Period, including the Company's sales of securities to investors, including the sale of 4,590,000 of Winstar stock and other securities to an investor group in a private placement for $270,000,000. During the Company's third quarter of fiscal 2000, the Company also used its common stock in transactions with other persons, including the sale of 322,283 shares to Lakeside Ventures LLC in exchange for media and services, and the sale of 16,682 shares to "several individuals" for acquisitions.

  41.  By virtue of the foregoing, the Company and defendants Rouhana, Kantor and Uhl have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

  42.  Plaintiffs and other members of the Class have been damaged by these defendants' violations as described in this Count and seek recovery for the damages caused thereby.

## COUNT II

### Violations of § 20(a) of the Exchange Act

### Against Defendants Rouhana, Kantor and Uhl

  43.  Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against defendants Rouhana, Kantor and Uhl.

  44.  As set forth above, defendants Rouhana, Kantor and Uhl were each controlling persons of Winstar within the meaning of Section 20(a) of the Exchange Act as alleged herein, and had the power to influence and control and/or did influence and control, directly or indirectly, the decision-making of Winstar, including the practices and efforts undertaken with respect to Winstar which plaintiffs contend are deceitful.

  45.  As set forth above, Winstar violated Section 10(b) and Rule 10b-5 as alleged in this Complaint. By virtue of their positions as a controlling persons, defendants Rouhana, Kantor and Uhl are liable pursuant to Section 20(a) of the Exchange Act. As a direct and

proximate result of the wrongful conduct of these defendants, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### *PRAYER FOR RELIEF*

**WHEREFORE**, plaintiff prays for judgment as follows:

A. An order certifying the Class as set forth herein and designating plaintiff as the Class representative and his counsel as Class counsel;

B. A judgment declaring the conduct of the Defendants to be in violation of law as set forth herein;

C. A judgment awarding plaintiff and the other members of the Class compensation for the damages which they have sustained as a result of the Defendants' unlawful conduct stated above;

D. A judgment awarding plaintiff's reasonable attorneys' fees, experts' fees, interest and cost of suit; and

E. Such other and further relief as this Court may deem just.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: April 10, 2001

Respectfully submitted,

SHALOV STONE & BONNER

By: *Ralph M Stone*
Ralph M. Stone (RS-4488)
Kenneth A. Ricken (KR-0217)

276 Fifth Avenue, Suite 704
New York, New York 10001
(212) 686-8004
Fax (212) 686-8005

-and-

Robert P. Sugarman (RS-8001)
LAW OFFICES OF ROBERT P. SUGARMAN
50 Charles Lindbergh Blvd., Suite 400
Uniondale, New York 11553
(516) 390-4748
Fax (516) 390-4749

*Attorneys for Plaintiff*

CLASS ACTION CERTIFICATION

I declare as to the claims asserted under the federal securities laws that:

1. I have reviewed the complaint prepared by counsel in the above-captioned case and authorize the filing of the same or a similar complaint on my behalf.

2. I did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the proposed Class Period, I executed the following transactions relating to Winstar securities (fill in dates and amounts of all transactions, indicating "bought" or "acquired" and "sold" and prices):

| Date     | Transaction                                                                      |
|----------|----------------------------------------------------------------------------------|
| 10/11/00 | Bought 1000 shares at $19.1875                                                   |
| 12/20/00 | Sold 1000 shares at $12.375                                                      |
| 12/29/00 | Sold 300 shares at $11.875 (relating to shares purchased before class period)    |
| 02/19/01 | Bought 3000 shares at $4.00                                                      |

5. In the past three years, I have not sought to serve nor served as a representative party on behalf of a class in an action filed under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 9th day of April, 2001.

Signed: _____
        Sanford Gould