N.Y.S.D. Case #
01-cv-3014(GBD)

10-4028-cv(L)
BIM Intermobiliare SGR v. Grant Thornton LLP

1
2 **UNITED STATES COURT OF APPEALS**
3 **FOR THE SECOND CIRCUIT**
4
5
6 August Term, 2011
7
8 Argued: November 2, 2011    Decided: July 19, 2012    Amended: August 29, 2012
9
10 Docket Nos. 10-4028-cv(L), 10-4280-cv(CON)
11
12
13 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
14
15 SANFORD GOULD, Individually, and on behalf
16 of all others similarly situated, YAN SUN,
17 BULLDOG CAPITAL MANAGEMENT LP, KEVIN
18 SHERMAN, MAX C. MICHAELS, ROBIN
19 KWALBRUN, ELEANORE REZNICK, FRANK
20 ZAPPARIELLO, THEODORE S. GUTOWICZ,
21 DAVID RICH, RICHARD SULENTIC, ANDRES
22 RIOS,
23
24          Plaintiffs,
25
26               –and–
27
28 BIM INTERMOBILIARE SGR, a wholly-owned
29 subsidiary of BANCA INTERMOBILIARE DI
30 INVESTIMENTI E GESTIONI SPA, ROBERT
31 AHEARN, DRYE CUSTOM PALLETS,
32 JEFFERSON INSURANCE COMPANY OF NEW
33 YORK, ALLIANZ LIFE INSURANCE COMPANY
34 OF NEW YORK, INTERNATIONAL
35 REINSURANCE COMPANY, S.A., LIFE USA,
36 AGF AMÉRIQUE, AGF HOSPITALIERS, AGF
37 ASSET MANAGEMENT, FIREMAN'S FUND
38 INSURANCE COMPANY, THE NORTHERN TRUST
39 COMPANY as trustee of the FIREMAN'S FUND
40 INSURANCE COMPANY MASTER RETIREMENT
41 TRUST and as trustee of the FIREMAN'S FUND

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 29, 2012

1

CERTIFIED COPY ISSUED ON 08/29/2012

1    INSURANCE COMPANY MASTER RETIREMENT
2    SAVINGS TRUST, ALLIANZ INSURANCE
3    COPMANY, ALLIANZ LIFE INSURANCE
4    COMPANY OF NORTH AMERICA, ALLIANZ
5    ASSET MANAGEMENT NORTH AMERICAN
6    EQUITY, US ALLIANZ DIVERSIFIED ANNUITY,
7    US ALLIANZ GROWTH ANNUITY, US ALLIANZ
8    VARIABLE INSURANCE PRODUCTS TRUST,
9    AZOA GROWTH FUND, AZOA DIVERSIFIED
10   ASSETS FUND, ALLIANZ OF AMERICA, INC.,
11   ALLIANZ CORNHILL INSURANCE PLC,
12   CORNHILL PENSION NORTH AMERICAN
13   EQUITY FUND, CORNHILL LIFE INSURANCE,
14   MERCHANT INVESTORS ASSURANCE
15   COMPANY LIMITED, and CORNHILL LIFE
16   NORTH AMERICAN EQUITY FUND,
17
18              Plaintiffs-Appellants,
19
20                   v.
21
22   WINSTAR COMMUNICATIONS, INC., WILLIAM
23   J. ROUHANA, JR., RICHARD J. UHL, NATHAN
24   KANTOR, ROBERT K. MCGUIRE,
25
26              Defendants,
27
28               –and–
29
30   GRANT THORNTON LLP,
31
32              Defendant-Appellee.[*]
33
34   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
35
36
37
38
39
40

---

[*] The Clerk of the Court is respectfully directed to amend the official caption as set forth above.

Before: SACK, HALL, and LOHIER, Circuit Judges.

Plaintiffs-Appellants appeal from a judgment of the United States District Court for the Southern District of New York (Daniels, J.) granting the motion for summary judgment of Defendant-Appellee Grant Thornton LLP ("GT") and dismissing the Plaintiffs' claims under Sections 10(b) and 18 of the Securities Exchange Act of 1934. Those claims related to GT's auditing of the financial statements of Winstar Communications, Inc. ("Winstar"). Because triable questions of fact exist as to (1) whether GT acted with scienter in making alleged misrepresentations in its audit opinion letter, (2) whether the Plaintiffs purchased Winstar's stock in actual reliance on those representations, and (3) whether the Plaintiffs suffered losses as a result, we VACATE the judgment of the District Court and REMAND for further proceedings.

> JONATHAN K. LEVINE, Girard Gibbs LLP, New York, NY (Daniel C. Girard, Girard Gibbs LLP, San Francisco, CA, on the brief), for Plaintiffs-Appellants Jefferson Insurance Company of New York, Allianz Life Insurance Company of New York, International Reinsurance Company, S.A., Life USA, AGF Amérique, AGF Hospitaliers, Fireman's Fund Insurance Company, The Northern Trust Company as trustee of the Fireman's Fund Insurance Company Master Retirement Trust and as trustee of the Fireman's Fund Insurance Company Master Retirement Savings Trust, Allianz Insurance Company, Allianz Life Insurance Company of North America, Allianz Asset Management North American Equity, US Allianz Diversified Annuity, US Allianz Growth Annuity, US Allianz Variable Insurance Products Trust, AZOA Growth Fund, AZOA Diversified Assets Fund, Allianz of America, Inc., AGF Asset Management, Allianz Cornhill Insurance PLC, Cornhill Pension North American Equity Fund, Cornhill Life Insurance, Merchant Investors Assurance Company Ltd., and Cornhill Life North American Equity Fund.
>
> PATRICK L. ROCCO (Lee S. Shalov, Susan Marlene Davies, on the brief), Shalov Stone Bonner & Rocco LLP, New York, NY, for Plaintiffs-Appellants BIM Intermobiliare SGR, a wholly-owned subsidiary of Banca Intermobiliare di Investimenti E Gestioni SpA, Robert Ahearn, and DRYE Custom Pallets.

JAMES L. BERNARD, Stroock & Stroock & Lavan
LLP, New York, NY (Larry K. Elliot, Cohen &
Grigsby P.C., Pittsburgh, PA, on the brief), for
Defendant-Appellee Grant Thornton LLP.

LOHIER, Circuit Judge:

Plaintiffs-Appellants appeal from a September 2010 judgment of the United States

District Court for the Southern District of New York (Daniels, J.) granting the summary

judgment motion of Defendant-Appellee Grant Thornton LLP ("GT") and dismissing the

Plaintiffs' claims arising from GT's audit of the financial statements of its client, Winstar

Communications, Inc. ("Winstar").  The Plaintiffs claimed that GT committed securities fraud in

violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Act"

or the "Exchange Act"), and 17 C.F.R. § 240.10b-5, and made false and misleading statements in

an audit opinion letter in violation of Section 18 of the Act, 15 U.S.C. § 78r.  We conclude that

genuine issues of material fact exist as to each of these claims.  We therefore VACATE the

District Court's grant of summary judgment and REMAND for further proceedings.

**BACKGROUND**

1. Facts

Reviewing the District Court's grant of summary judgment in favor of GT, "we construe

the evidence in the light most favorable to the [Plaintiffs], drawing all reasonable inferences and

resolving all ambiguities in [their] favor."[1]  In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501,

504 (2d Cir. 2010) (quotation marks omitted).

---

[1] The Plaintiffs fall into two groups.  BIM Intermobiliare SGR and other plaintiffs
(collectively, the "Lead Plaintiffs") assert claims under Section 10(b) in a putative class action
on behalf of investors who purchased Winstar common stock and bonds between March 10,
2000 and April 2, 2001.  Jefferson Insurance Company of New York and twenty-four related
entities (collectively, the "Jefferson Plaintiffs") purchased Winstar common stock from
December 1998 to at least February 2001 and bring claims under both Sections 10(b) and 18.

1    Winstar was a broadband communications company whose core business was to provide

2    wireless Internet connectivity to various businesses.  GT served as Winstar's independent auditor

3    from 1994 until Winstar filed for bankruptcy in April 2001, and GT regarded Winstar as "one of

4    [its] largest and most important clients."[2]

5    In 1999, however, the relationship deteriorated.  Winstar warned GT that it would likely

6    terminate the relationship if GT's performance on unrelated international tax planning and other

7    accounting matters proved unsatisfactory.  In March 1999 at least one member of Winstar's

8    board of directors openly urged during a board meeting that the GT partner overseeing the audit

9    of Winstar be removed from the Winstar account.  GT eventually re-staffed the Winstar account

10    so that the 1999 audit was managed by a partner, Gary Goldman, and a senior manager, Patricia

11    Cummings, neither of whom had previously reviewed or audited the financial records of a

12    telecommunications company.

13    As relevant to this appeal, GT's audit for 1999 included several "large account"

14    transactions that Winstar consummated in an attempt to conceal a decrease in revenue associated

15    with Winstar's core business.  Most of the large account transactions involved Lucent

16    Technologies, Inc. ("Lucent"), Winstar's strategic partner, and all of them were consummated at

17    the end of Winstar's fiscal quarters in 1999.  Together, the transactions accounted for $114.5

18    million in revenue, or approximately 26 percent of Winstar's reported 1999 operating revenues

19    and 32 percent of its "core" revenues that year.  At the time, GT considered these transactions to

---

[2] Most of the revenue that GT derived from Winstar was from consulting rather than auditing.  In 1999, for example, GT earned $275,000 for its auditing work for Winstar, compared with over $2 million in consulting fees.

1    be "red flags," warranting the accounting firm's "heightened scrutiny."[3]  However, GT

2    ultimately approved Winstar's recognition of revenue in connection with each of these

3    transactions.

4         We discuss the evidence relating to each category of transaction in turn.

5              A.  Questionable Sales

6         The first category of questionable transactions involved a series of six end-of-quarter and

7    end-of-year transactions, primarily reported as equipment sales, for which there was little

8    evidence that any goods or services were ordered and delivered.  For example, for the third

9    quarter of 1999 Winstar recognized $15 million in revenue for the sale of Lucent equipment to

10   Anixter Brothers, Inc. ("Anixter"), a wire and cable distributor.  There were several unusual

11   aspects of this sale.  First, Anixter ordinarily purchased equipment directly from Lucent, not

12   Winstar.  Second, equipment sales were not part of Winstar's core business of creating and

13   operating wireless networks.  Third, during GT's audit Cummings noted that the Anixter

14   transaction was "apparently" completed on September 30, 1999, the last day of Winstar's fiscal

15   quarter, but GT's work papers included no documents reflecting the sale's completion beyond a

16   purchase order from Winstar to Lucent and an invoice from Lucent to Winstar.  Moreover,

17   neither the purchase order nor the invoice included an itemized list of the goods sold or indicated

18   the shipping terms, even though the items were to be shipped on September 30, 1999, and

---

[3] The Public Company Accounting Oversight Board has recognized that one risk factor indicating potential fraud would be "[s]ignificant, unusual, or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions."  Joint App. at 3619 (quoting Am. Inst. of Certified Pub. Accountants, Statement on Accounting Standards ("AU") § 316.17 (alterations in original)).  Similarly, GT acknowledged that large, end-of-quarter transactions would warrant heightened scrutiny during the audit process.

1    delivered on October 4, 1999.[4]  Absent too was any document evidencing Anixter's agreement to

2    purchase the items.  Lastly, not a single employee of Lucent, Winstar, or Anixter who was asked

3    about the equipment sale could recall it.

4           Five other transactions that were not part of Winstar's core business were consummated

5    at the end of one of Winstar's fiscal quarters and were barely documented.  Winstar nevertheless

6    recognized a total of $49.7 million in revenue associated with these five transactions.  First,

7    Winstar recognized $5 million in revenue in the first quarter of 1999 for a "feasibility study" that

8    Winstar was scheduled to conduct for Lucent, but which had not been delivered by at least 2000.

9    Second, Winstar recognized $21.1 million in revenue in the first and second quarters of 1999 in

10   connection with the sale of Lucent equipment to Williams Communications, Inc. ("Williams").

11   The equipment was shipped by Lucent, not Winstar, on the last business day of the first and

12   second quarters (March 31, 1999 and June 30, 1999, respectively), with no written agreement.

13   Third, Winstar recognized $9.1 million in revenue in the second quarter of 1999 in connection

14   with the sale of Lucent equipment to VoCall Communications Corporation ("VoCall") on June

15   30, 1999.  Although the sale was referenced in a series of non-numbered purchase orders, it was

16   not referenced in any executed, final agreement or shipping document.  Fourth, Winstar

17   recognized $4.5 million in revenue in the third quarter of 1999 in connection with the sale of

18   unspecified "WinStar Equipment" to Cignal Global Communications ("Cignal"), which was

---

[4] As stated by the Securities and Exchange Commission ("SEC"), "delivery generally is
not considered to have occurred unless the customer has taken title and assumed the risks and
rewards of ownership of the products specified in the customer's purchase order or sales
agreement.  Typically this occurs when a product is delivered to the customer's delivery site (if
the terms of the sale are 'FOB destination') or when a product is shipped to the customer (if the
terms are 'FOB shipping point')."  SEC Staff Accounting Bulletin No. 101: Revenue
Recognition in Financial Statements, 17 C.F.R. Part 211, at 6 (Dec. 3, 1999) ("SAB 101"),
available at http://www.sec.gov/interps/account/sab101.htm (last visited June 28, 2012).

1    contracted for on September 30, 1999, the last day of that quarter.  However, GT was unable to

2    produce a document evidencing that the equipment had been shipped to Cignal during that

3    quarter.  Fifth, Winstar recognized $10 million in revenue in the fourth quarter of 1999 in

4    connection with the sale of wireless radio equipment ("radios") to Lucent under an agreement

5    dated December 30, 1999.  GT endorsed the recognition of revenue even though its work papers

6    included shipping documents with conflicting dates, no document specified the goods purchased,

7    and Lucent, not Winstar, was in the business of manufacturing and selling radios.  The same

8    agreement also involved a $2 million "promotional credit" purchased by Lucent for services that

9    had not yet been rendered by Winstar.  Although GT specifically advised Winstar that

10   recognizing and recording the amount of the credit as revenue was improper and in violation of

11   generally accepted accounting principles ("GAAP"),[5] Winstar nevertheless recognized the full

12   $2 million in revenue.

13          Each of these transactions appears to have violated the provisions of Staff Accounting

14   Bulletin No. 101 ("SAB 101"), issued by the Securities and Exchange Commission ("SEC"),

15   which states that four conditions must be satisfied before revenue can be recognized:  (1)

16   "Persuasive evidence of an arrangement [for the sale of goods or services] exists," (2)  "Delivery

---

[5] "GAAP [are] those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. [They are] established by the American Institute of Certified Public Accountants . . . ."  In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 325 n.5 (S.D.N.Y. 2004) (quotation marks and citations omitted).  "[The] single unified purpose [of GAAP] . . . [is] to increase investor confidence by ensuring transparency and accuracy in financial reporting."  Id. at 339.

1    has occurred or services have been rendered," (3) "The seller's price to the buyer is fixed or

2    determinable," and (4) "Collectibility is reasonably assured."  SAB 101 at 3.[6]

3           GT requested that Winstar's counterparties provide additional documentary evidence of

4    the relevant sales underlying each questionable transaction.  By doing so, consistent with SAB

5    101, GT sought to obtain independent support for Winstar's recognition of revenue for each

6    transaction – in other words, support from documents that were not generated by Winstar itself.

7    As of February 10, 2000, GT still had not received responsive documents from four of these

8    customers.  Nonetheless, it issued an audit opinion letter opining that Winstar's 1999 financial

9    statements accurately reflected its financial condition and complied with GAAP.

---

[6] The SEC has elaborated upon the delivery requirement as follows:

> [D]elivery generally is not considered to have occurred unless the product has been delivered to the customer's place of business or another site specified by the customer. . . .
>
>    . . .
>
> A seller should substantially complete or fulfill the terms specified in the arrangement in order for delivery or performance to have occurred.  When applying the substantially complete notion, the staff believes that only inconsequential or perfunctory actions may remain incomplete such that the failure to complete the actions would not result in the customer receiving a refund or rejecting the delivered products or services performed to date.

SAB 101 at 6 (footnotes omitted).  In addition, revenue may be recognized in the absence of delivery only if a transaction meets seven requirements, including (1) that "[t]he risks of ownership . . . passed to the buyer"; (2) that "the buyer, not the seller . . . request . . . that the transaction be on a bill and hold basis," based on a "substantial business purpose" of the buyer; and (3) that the seller not retain "any specific performance obligations such that the earning process is not complete."  Id. (footnotes omitted).  In its Form 10-K, Winstar stated, "Revenues from equipment sales are recognized when the equipment is delivered to the customer.  Professional services revenues are recognized under the percentage of completion method."  Joint App. at 538.

1                B.  <u>Bifurcated Accounting</u>

2           In connection with at least three other transactions, Winstar employed a bifurcated

3    accounting scheme that GT ultimately approved prior to its audit of Winstar's financial

4    statements.  Two of these transactions involved leasing or subleasing fiber optic network

5    capacity in units called indefeasible rights of use ("IRUs").  Winstar accounted for these IRUs

6    using a dubious bifurcated accounting method, pursuant to which it recognized as much as 94

7    percent of the revenue from the leases upon execution of the lease, reflecting the cost of optical

8    equipment ("optronics") that transmitted data over fiber optic cable ("cable" or "fiber").  Winstar

9    then would recognize the balance of the revenue in later quarters, as payments were received

10   over the span of the lease, representing the customer's actual use of the network.  In other words,

11   Winstar split the value of the leases so that the revenue associated with the optronics was

12   reported separately from revenue associated with the cable.  By employing this accounting

13   method, Winstar was able to recognize $30.9 million in revenue up front in 1999.

14         During discovery, a forensic accountant retained by the Plaintiffs opined that the rules of

15   the Financial Accounting Standards Board and interpretive rules of the SEC prohibited the

16   division of leases for fiber optic networks because both the cable and the optronics were

17   essential to the network.  Winstar conceded that the fiber and the optronics were not separable,

18   and that no other company previously had employed this bifurcated method in accounting for

19   IRUs.  Indeed, Winstar specifically advised GT that the bifurcated approach had been criticized

20   by the accounting firm Deloitte & Touche LLP ("Deloitte").

21         GT was in any event aware that revenue associated with an IRU contract could be

22   recognized only if the leased circuit was operational, or "lit," in the language of the fiber optics

23   field.  In the third and fourth quarters of 1999, however, Winstar had failed to "light" many of its

1    IRU circuits, a fact that should have precluded the company from recognizing revenue associated

2    with those IRUs.

3            In the midst of GT's audit, Winstar sent form letters dated December 30, 1999, and

4    December 31, 1999, to the counterparties to the two IRU transactions, Wam!Net, Inc. and

5    Cignal, respectively, to confirm that the IRU circuits had been "deliver[ed]" and "accept[ed]."  A

6    representative of Cignal signed a form letter confirming delivery and acceptance of the circuits.

7    By contrast, Wam!Net's Senior Vice President of Finance responded to a letter from Winstar as

8    follows:  "To our knowledge [the circuits] are not currently in place."  A subsequent amended

9    letter from a different Wam!Net employee, which does not appear in the record but which

10   Cummings referenced in an email, purported to "accept" the circuits but did not address the

11   earlier letter response.  After receiving the amended letter, GT did not further review whether the

12   circuits were installed and operational.  Even though it appears not to have received the amended

13   letter until after February 11, 2000, GT approved Winstar's recognition of revenue for the

14   Wam!Net IRU circuit sale on February 10, 2000.

15           While GT appears to have neglected to verify that Wam!Net's IRU circuits were

16   operational, there was evidence that GT actually <u>knew</u> that the leased Cignal IRU circuits were

17   inoperative.  GT nevertheless approved Winstar's recognition of revenue for the Cignal IRUs in

18   the third quarter of 1999.

19           Winstar employed a similar bifurcated accounting method in the fourth quarter of 1999

20   for its sale of radios to Lucent.  The agreement between the two companies provided for Winstar

21   to install the radios, but Winstar recognized revenue for the transaction immediately, upon

1   delivering them to Lucent.[7]  GT expressed doubt that the radios and installation services were

2   separable,[8] but it nevertheless approved of Winstar's recognition of $10 million in revenue in

3   connection with the transaction.

4                   C.   Round-Trip Transactions

5           Several of the transactions discussed above involved "round-trip" transactions with

6   Cignal and Wam!Net at a time when the two customers were struggling financially.  "'Round-

7   tripping' typically refers to reciprocal agreements, involving the same products or services, that

8   lack economic substance but permit [both] parties to book revenue and improve their financial

9   statements."  Teachers' Ret. Sys. of LA v. Hunter, 477 F.3d 162, 169 (7th Cir. 2007).  The two

10  principal round-trip transactions that were the focus of discovery involved a scheme pursuant to

11  which Winstar overpaid both companies for purportedly unrelated goods and services in

12  exchange for their purchase of IRUs, equipment, and services from Winstar by the end of

13  Winstar's third fiscal quarter of 1999 (Cignal), and the end of the fourth quarter of 1999

14  (Wam!Net).

15          Both round-trip transactions were material to Winstar's financial performance in 1999.

16  In the larger of the two transactions, Winstar recognized approximately $39 million in revenue in

17  the third and fourth quarters of 1999 in connection with sales to Cignal while it paid Cignal

18  $29.5 million under a separate agreement during the same time period and an additional $4.8

19  million in the first quarter of 2000.  Similarly, Winstar recognized $19.6 million in revenue in

20  connection with sales to Wam!Net in the fourth quarter of 1999, even as it paid Wam!Net $25

---

[7] Winstar also employed a bifurcated accounting method when it recognized $16.5 million in revenue in connection with a sale of radios to Wam!Net in the fourth quarter of 1999. As with the IRU accounting, it did so contrary to Deloitte's advice but with GT's approval.

[8] GT also expressed serious doubts about whether Lucent had assumed the risks and rewards of ownership of the radios, given the generous terms of a warranty Winstar extended to Lucent.

1   million in the same quarter for "prepaid marketing" and the lease of a "data service center."  In

2   February 2000 GT questioned the "[a]rms length nature of the [round-trip] transactions."  It later

3   acknowledged that the transactions "raise[d] a concern" within GT "as to whether or not absent

4   Winstar's payment . . . collectability was reasonably assured."  Nevertheless, GT approved

5   Winstar's recognition of the full amount of revenue for both transactions.

6   　　　　　　　　　　D.  The Audit Opinion Letter

7   　　　　　By letter dated February 10, 2000, GT issued an unqualified audit opinion letter stating

8   that Winstar's annual Form 10-K report for fiscal year 1999 complied with GAAP and fairly

9   represented Winstar's financial condition at the end of that year:

10  　　　　　　　　　We have audited the accompanying consolidated balance
11  　　　　　　　　sheets of Winstar Communications, Inc. . . .

12  　　　　　　　　　We conducted our audits in accordance with auditing
13  　　　　　　　　standards generally accepted in the United States.  Those standards
14  　　　　　　　　require that we plan and perform the audit to obtain reasonable
15  　　　　　　　　assurance about whether the financial statements are free of material
16  　　　　　　　　misstatement. . . .  We believe that our audits provide a reasonable
17  　　　　　　　　basis for our opinion.

18  　　　　　　　　　In our opinion, the consolidated financial statements referred
19  　　　　　　　　to above present fairly, in all material respects, the consolidated
20  　　　　　　　　financial position of Winstar Communications, Inc. and Subsidiaries
21  　　　　　　　　as of December 31, 1999 . . . in conformity with accounting
22  　　　　　　　　principles generally accepted in the United States.
23
24  Joint App. at 529.

25  　　　　　　　　　E.  Investment by the Jefferson Plaintiffs

26  　　　　　From December 1998 to February 2001, the Jefferson Plaintiffs purchased over $200

27  million worth of Winstar stock.  The investment portfolios of most of the Jefferson Plaintiffs

28  were managed by Ronald Clark, the Chief Investment Officer for Allianz of America

29  ("Allianz"). The remaining entities deferred to Clark to select their investments in United States

30  securities.  Although Clark enjoyed ultimate authority for these investment decisions, he relied

1    on recommendations from a team of analysts, including Livia Asher, who recommended that

2    Allianz purchase Winstar stock.  Based on Asher's recommendation, Clark caused Allianz and

3    the other Jefferson Plaintiffs to invest in Winstar.

4            Clark, it appears, did not personally review Winstar's financial statements prior to

5    making the decision to invest in Winstar.  Instead, he relied on Asher to review the statements as

6    part of her job.  During discovery, however, Asher acknowledged that she was uncertain of the

7    date of, or reason for, her recommendation that Allianz purchase Winstar stock.  Nor could she

8    specifically recall reading Winstar's 1999 Form 10-K report.  However, Asher testified that she

9    "probably flipped through every single page" of the report, based on her practice.  She explained,

10   "I can't imagine any reason why I would not have looked at this, . . . given our position in the

11   stock and given what I would normally do."  Asher added that she habitually read auditors'

12   opinion letters included in Forms 10-K to make sure that auditors believed that an issuer's

13   reports were "kosher," but she did not specifically recall reviewing GT's audit report.

14                   F.  Winstar's Decline

15           Winstar's stock reached a price per share of over $60 in March 2000.  In May 2000

16   Lucent provided Winstar with financing in the form of a renewed credit facility in the aggregate

17   amount of $2 billion.  Almost a year later, however, in March 2001, Asensio & Company

18   ("Asensio"), an investment firm, issued a press release criticizing Winstar's ability to pay its

19   debts and explaining that certain measurements of Winstar's financial performance were

20   "questionable" due in part to Winstar's "revenue recognition from non-core businesses and sales

21   of equipment and services to related parties."  Joint App. at 2412.  The same press release

22   warned that "[a]ny adjustment to Winstar's aggressive revenue accounting and capitalization of

23   cash expenditures would negatively and materially impact Winstar's reported [earnings] and

1    analyst's [sic] opinions of its operations." <u>Id.</u> at 2413.  On March 19, 2001, Asensio issued

2    another press release reporting on Winstar's "debt collapse," again criticizing its revenue

3    accounting practices and noting, "Winstar has recognized revenues that created a slew of

4    uncollected items . . . .  Its revenues include sales to related parties and non-core items such as

5    equipment sales and installation services." <u>Id.</u> at 2414.

6          The Asensio press releases preceded a significant downgrade in Winstar's credit rating

7    on April 3, 2001.  Moreover, on April 16, 2001, Winstar announced that Lucent was cancelling

8    Winstar's credit facility, that Winstar would delay filing its Form 10-K report for 2000, and that

9    Winstar was considering a reorganization under Chapter 11 of the Bankruptcy Code.

10         By the time of the Asensio press releases, Winstar's revenues and its stock price had

11    decreased significantly during a marketwide decline in the prices of technology stocks.

12    However, the press releases, coupled with the subsequent announcements of Winstar's financial

13    troubles, were followed almost immediately by an additional steep decline in Winstar's stock

14    price, from over $10 per share before March 2001 to $0.14 per share by mid-April 2001.  On

15    April 18, 2001, Winstar filed for bankruptcy.

16         During discovery, an economist retained by the Plaintiffs as an expert witness attributed

17    the decline in Winstar's stock price to, among other causes, the partial disclosure of Winstar's

18    alleged fraud by Asensio.  The economist calculated that members of the putative class who had

19    purchased Winstar common stock lost as much as $974 million, that class members who

20    purchased Winstar notes lost up to $197 million, and that the Jefferson Plaintiffs lost over $96

21    million by investing in Winstar stock.

22

23

1    2. <u>Procedural History</u>

2        On April 10, 2001, the Lead Plaintiffs filed a putative class action complaint in the

3    Southern District of New York against Winstar, GT, Lucent, and certain Winstar executives

4    alleging securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).  In

5    December 2001 the Jefferson Plaintiffs filed a separate complaint in the District Court against

6    GT, claiming violations of both Section 10(b) and Section 18 of the Exchange Act, 15 U.S.C. §

7    78r(a).[9]  As a result of various settlements among the parties, the claims against GT were all that

8    remained by 2008.  After discovery, GT moved for summary judgment to dismiss the Plaintiffs'

9    claims and also moved unsuccessfully to preclude the Plaintiffs' expert loss causation analysis.

10       In September 2010 the District Court granted GT's motion for summary judgment,

11   concluding that (1) the Plaintiffs had failed to demonstrate that a genuine dispute of material fact

12   existed as to whether GT acted intentionally or recklessly, as required under Section 10(b) of the

13   Exchange Act, and (2) the Jefferson Plaintiffs had failed to demonstrate that such a dispute

14   existed as to whether they actually relied on GT's audit opinion letter, as required under Section

15   18 of the Exchange Act.  <u>In re Winstar Commc'ns Sec. Litig.</u>, No. 01 CV 11522 (GBD), 2010

16   WL 3910322, at *5-6 (S.D.N.Y. Sept. 29, 2010).

17       This appeal followed.

18                              **DISCUSSION**

19       We review a district court's grant of summary judgment <u>de novo</u>, viewing the evidence in

20   the light most favorable to the non-moving party and drawing all reasonable inferences and

21   resolving all ambiguities in its favor.  <u>E.g.</u>, <u>Grain Traders, Inc. v. Citibank, N.A.</u>, 160 F.3d 97,

22   100 (2d Cir. 1998).  We will affirm the judgment "only if there is no genuine dispute as to any

---

[9] Although the Defendants filed motions to dismiss in June 2002, the District Court did not rule on them.  Similarly, a motion for class certification was filed but never resolved by the District Court.

16

1    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

2    "There is no genuine issue of material fact where the record taken as a whole could not lead a

3    rational trier of fact to find for the non-moving party."  Durakovic v. Bldg. Servs. 32 BJ Pension

4    Fund, 609 F.3d 133, 137 (2d Cir. 2010) (quotation marks and brackets omitted).  Put another

5    way, "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a

6    verdict for the nonmoving party."  Omnicom, 597 F.3d at 509 (quotation marks omitted).

7         To sustain a claim under Section 10(b) of the Exchange Act and Rule 10b-5, the

8    Plaintiffs must show "(i) a material misrepresentation or omission; (ii) scienter; (iii) 'a

9    connection with the purchase or sale of a security[;]' (iv) reliance by the plaintiff(s); (v)

10   economic loss; and (vi) loss causation."  Id. (alteration in original) (quoting Dura Pharms., Inc.

11   v. Broudo, 544 U.S. 336, 341-42 (2005)).

12        1.  Scienter

13        Plaintiffs may satisfy the scienter requirement by producing "evidence of conscious

14   misbehavior or recklessness."  See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP

15   Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).  Scienter based on conscious misbehavior,

16   in turn, requires a showing of "deliberate illegal behavior," Novak v. Kasaks, 216 F.3d 300, 308

17   (2d Cir. 2000), a standard met "when it is clear that a scheme, viewed broadly, is necessarily

18   going to injure," AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 221 (2d Cir. 2000)

19   (alterations omitted).

20        In AUSA Life, we applied this standard to representations by the accounting firm Ernst

21   & Young ("E & Y"), which, as plaintiffs allege with respect to GT, "consistently noticed,

22   protested, and then acquiesced in" the financial misrepresentations of an audit client under

17

1   pressure from the client's management.  Id. at 205.  We held that by issuing an unqualified audit

2   report despite its knowledge of accounting improprieties by the client, E & Y "intentionally

3   engaged in manipulative conduct," id. at 221 (quotation marks omitted), in violation of Section

4   10(b).  We explained that

5               E & Y is not an accounting dilettante.  It knows well that its opinions
6               and certifications are afforded great weight, and it must have known
7               that its financial certifications with regard to [its client] would be
8               compelling to the investors. . . .  [I]t is sufficient [for the purposes of
9               showing scienter] for a plaintiff to allege and prove that a defendant
10              could have foreseen the consequences of his actions but forged ahead
11              nonetheless . . . .

13  Id.; see also SEC v. KPMG LLP, 412 F. Supp. 2d 349, 379 (S.D.N.Y. 2006) (triable issue as to

14  conscious fraud existed when accountant was "[a]ware of [the client's] earnings pressures" but

15  allowed aggressive accounting policies "without any serious study to determine that these

16  unusual, indeed unique, accounting treatments would result in financial statements that fairly

17  represented [the client's] financial condition").

18          Scienter based on recklessness may be demonstrated where a defendant has engaged in

19  conduct that was "highly unreasonable, representing an extreme departure from the standards of

20  ordinary care . . . to the extent that the danger was either known to the defendant or so obvious

21  that the defendant must have been aware of it."  Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir.

22  2000) (quotation marks omitted).  Recklessness may be established where a defendant "failed to

23  review or check information that [it] had a duty to monitor, or ignored obvious signs of fraud."

24  Novak, 216 F.3d at 308.

25          The District Court concluded that Winstar engaged in "dubious accounting practices,"

26  that "[m]uch of the supporting documentation that Winstar supplied to GT was a mere

1   contrivance meant to paper the transactions and create the appearance of legitimacy," and that

2   GT "failed to uncover the accounting fraud being perpetuated by the Winstar defendants."

3   <u>Winstar</u>, 2010 WL 3910322, at *3, *5.  GT does not seriously dispute these conclusions, which

4   are in any event supported by the record before us.  The District Court concluded, however, that

5   the evidence demonstrated only that GT was "performing its role as [Winstar's] independent

6   auditor" and fell short of demonstrating scienter in the form of either conscious misbehavior or

7   recklessness.  <u>Id.</u> at *3.  We disagree.

8        Some evidence supports the Plaintiffs' contention that GT consciously ignored Winstar's

9   fraud when it approved Winstar's recognition of revenue for the suspicious 1999 transactions.

10   This evidence goes beyond a mere failure to uncover the accounting fraud and, in general, relates

11   to (1) Winstar's recognition of revenue for the sale of equipment or services without sufficient

12   indicia of delivery, (2) its recognition of all revenue associated with the incomplete sale of

13   telecommunications systems, and (3) its recognition of revenue for sales of IRUs, equipment,

14   and services to financially unstable companies to whom Winstar paid back large sums under

15   separate contractual obligations.

16        There is also evidence that GT failed to confirm Winstar's representations regarding

17   these transactions or to retain and review documents evidencing each transaction.  Indeed, an

18   expert forensic accountant retained by the Plaintiffs testified that GT's failure to exercise due

19   professional care, gather reliable documents, and issue an adverse opinion in this regard

20   represented a violation of Generally Accepted Auditing Standards ("GAAS")[10] with regard to all

---

[10] Under GAAS, a central "'objective of the independent auditor's engagement is to obtain sufficient competent evidential matter to provide him with a reasonable basis for forming an opinion.'"  Joint App. at 3604 (quoting AU § 9326).  "'Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. .

1    of the challenged transactions.  Furthermore, the record evidence supports a conclusion that GT

2    knew, even under the terms of Winstar's bifurcated accounting method – a method that had been

3    criticized by Deloitte but reviewed and approved, with skepticism, by GT – that revenue could

4    not be properly recognized for IRUs unless the leased circuits were operational.  During

5    discovery, Cummings acknowledged that GT knew the circuits for the Cignal IRUs were not

6    operational.  Under these circumstances, GT's approval of Winstar's recognition of revenue for

7    the nonfunctional circuits presents a genuine issue of material fact as to whether GT acted with

8    the requisite scienter under Section 10(b).

9          We point to the IRU transactions only as one example of a transaction that suggests that

10   GT acted with scienter.  Triable issues regarding GT's scienter exist for the other questionable

11   transactions as well.  Broadly speaking, there was admissible evidence that in the course of its

12   audit GT learned of and advised against the use of indisputably deceptive accounting schemes,

13   but eventually acquiesced in the schemes by issuing an unqualified audit opinion.  See AUSA

14   Life, 206 F.3d at 221.  Based on this record, we cannot conclude that this and the other evidence

15   adduced by the Plaintiffs was insufficient to raise a genuine issue of material fact about whether,

16   in issuing an unqualified audit opinion letter, GT "agreed to [Winstar's] accounting abuses,

17   knowing . . . that [investors] and others would be receiving and relying upon the manipulated

18   financial reports."  Id.  At this stage, the Plaintiffs have proffered enough facts constituting

19   evidence of conscious misbehavior or recklessness to survive summary judgment.

20         We note that in granting summary judgment in GT's favor, the District Court placed

21   particular emphasis on the magnitude of GT's audit work, both in time spent and documents

. . [P]rofessional skepticism should be exercised throughout the audit process,'" and requires the
employment of "'a questioning mind'" in the "'gathering and objective evaluation of evidence,'"
including with regard to representations by management.  Id. at 3589-90 (quoting AU §§ 230.07-
08).

1    reviewed.  For example, it noted that GT "spent 1,928 hours of professional time," assembled

2    working papers spanning 3,000 pages, and reviewed "copies of contracts, Winstar business

3    plan[s], press releases, board minutes," and memos prepared by Winstar and GT addressing

4    accounting issues.  Winstar, 2010 WL 3910322, at *2.  The number of hours spent on an audit

5    cannot, standing alone, immunize an accountant from charges that it has violated the securities

6    laws.  Here, the Plaintiffs adduced evidence that, notwithstanding the magnitude of its audit, GT

7    repeatedly failed to scrutinize serious signs of fraud by an important client, including:  (1)

8    significant end-of-quarter transactions;[11] (2) the absence of documents confirming the goods or

9    services ordered by Winstar customers, the fact of delivery, or the existence of an underlying

10   agreement; (3) the repeated failure of Winstar or its clients timely to provide supporting

11   documentation requested by GT; (4) Winstar's transactions outside its core business; and (5)

12   round-trip transactions in which revenues were subsequently offset by Winstar's payments to

13   financially unstable customers under unrelated contractual obligations.

14           In short, regardless of the hours GT spent or the number of documents it reviewed in the

15   course of its 1999 audit of Winstar, a jury reasonably could determine that the audit was so

16   deficient as to be "highly unreasonable, representing an extreme departure from the standards of

---

[11] Here, only GT's February 10, 2000 audit opinion letter regarding Winstar's Form 10-K for fiscal year 1999 forms the basis for its liability under Section 10(b).  Winstar's quarterly financial reports for 1999, no matter how involved GT was in their formulation, cannot serve as independent grounds for Section 10(b) liability for GT because, unlike with the Form 10-K, GT never made any public statements vouching for their accuracy.  See McAdams v. McCord, 584 F.3d 1111, 1114 & n.2 (8th Cir. 2009).  That GT was involved in their formulation at best would give rise to aiding and abetting liability under Section 10(b), as to which there is no private cause of action.  See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994).  The end-of-quarter transactions are nevertheless relevant to the issue of GT's scienter because they should have raised red flags for GT as to whether they were genuine and could be reported on Winstar's end-of-year filing for fiscal year 1999.  Indeed, evidence in the record, including email communications between GT employees, suggests that GT remained troubled by many of these transactions around the time it filed its audit opinion letter.

1    ordinary care . . . to the extent that the danger was either known to [GT] or so obvious that [GT]

2    must have been aware of it."  <u>Rothman</u>, 220 F.3d at 90 (quotation marks omitted).

3            2.  <u>Reliance</u>

4            Section 18 of the Exchange Act, 15 U.S.C. § 78r(a), requires actual rather than

5    constructive reliance upon a materially false or misleading statement by one who has purchased

6    or sold a security.  <u>Heit v. Weitzen</u>, 402 F.2d 909, 916 (2d Cir. 1968).  The District Court

7    concluded that the Jefferson Plaintiffs failed to show reliance because they could not

8    demonstrate that they or their representatives "actually saw Winstar's 1999 Form 10-K filing,

9    much less read the included independent accountant report of GT."  <u>Winstar</u>, 2010 WL 3910322,

10   at *6.  Even assuming that such "eyeball" reliance is the sort of actual reliance required by our

11   precedents, the District Court's conclusion somewhat understates the record evidence on this

12   score.  Ronald Clark and Livia Asher worked on behalf of the Jefferson Plaintiffs.  Although

13   Asher was unable to recall specifically that she reviewed GT's audit opinion letter, there was

14   evidence that she actively reviewed such letters as a matter of practice in deciding whether to

15   recommend certain stocks.  At this stage of the proceedings, Asher's testimony is enough; from

16   that evidence, a jury reasonably could infer that she actually reviewed and relied on the relevant

17   statements in the documents.  <u>See, e.g.</u>, Fed. R. Evid. 406.  Accordingly, we conclude that the

18   District Court erred in granting summary judgment in GT's favor on the Jefferson Plaintiffs'

19   Section 18 claims.

20           3.  <u>Causation</u>

21           GT argues in the alternative that the District Court's grant of summary judgment should

22   be affirmed because the Plaintiffs failed to show loss causation.  We have described loss

23   causation as "the causal link between the alleged misconduct and the economic harm ultimately

1    suffered by the plaintiff." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d

2    189, 197 (2d Cir. 2003).  Among other things, the misconduct must be a "substantial factor in the

3    sequence of responsible causation." AUSA Life, 206 F.3d at 215 (quotation marks omitted).

4    With these principles in mind, however, we have also warned that "if the loss was caused by an

5    intervening event, like a general fall in the price of Internet stocks, the chain of causation will

6    not have been established[, b]ut such is a matter of proof at trial." Emergent Capital, 343 F.3d at

7    197; see also AUSA Life, 206 F.3d at 214-15 ("[W]hen the plaintiff's loss coincides with a

8    marketwide phenomenon causing comparable losses to other investors, the prospect that the

9    plaintiff's loss was caused by the fraud decreases.").

10          Relying largely on the deposition testimony of an expert witness economist, the Plaintiffs

11   argue that they have adduced proof of loss causation in the form of the press releases from

12   Asensio and Winstar's April 2001 announcements, which publicly exposed Winstar's substantial

13   financial weaknesses and together suggested for the first time that Winstar had engaged in

14   improper revenue recognition practices for a period of time that included 1999.  Although a

15   much closer call, a jury could reasonably infer based on the expert testimony and other evidence

16   that the precipitous decline in Winstar's stock price in 2001 was attributable in part to the

17   alleged fraud.

18          GT counters that any decline in Winstar's stock price that was not caused by broader

19   market trends resulted not from the alleged fraud but from Lucent's cancellation of its credit

20   facility.  This may be true for a portion of the collapse in Winstar's stock price.  There is support

21   as well for the argument that the downgrade in Winstar's credit rating resulted in a substantial

22   decline in the stock price.  But these facts, if established, hardly foreclose the reasonable

23   inference that some part of the decline was substantially caused by the disclosures about the

1    fraud itself.  We therefore conclude that a jury reasonably could find the requisite "causal link

2    between [Winstar's] alleged misconduct and the economic harm ultimately suffered" by the

3    Plaintiffs.  See Emergent Capital, 343 F.3d at 197.

4    **CONCLUSION**

5           We have considered GT's other arguments, and we conclude that they are without merit.

6    For the foregoing reasons, we VACATE the District Court's grant of summary judgment, and we

7    REMAND for further proceedings.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

24