

260 MADISON AVENUE • 17TH FLOOR • NEW YORK • NEW YORK • 10016

December 21, 2012

TELEPHONE
(212) 239-4340

FAX
(212) 239-4310

WEB
WWW.LAWSSB.COM

**Via Hand Delivery**

Hon. George B. Daniels
United States District Judge
United States Courthouse
500 Pearl Street, Room 630
New York, New York 10007-1312

    Re: *In re Winstar Communications Securities Litigation*, No. 01 Civ. 3014 (GBD)

Dear Judge Daniels:

  We write on behalf of all Plaintiffs in this matter in advance of the January 9, 2013 status conference to inform Your Honor of a matter that requires the Court's urgent attention. Long after the close of discovery and while this matter was on appeal, defendant Grant Thornton's ("GT") loss causation and damages expert, Frederick Dunbar of NERA, passed away. At the time of his death, Plaintiffs' *Daubert* challenge to Dunbar's expert opinions was pending before this Court. Following the reinstatement of the case by the Second Circuit, GT requested leave to replace Dunbar as its expert and to have its new expert submit a replacement report. Plaintiffs agreed to this request because the case law is clear that GT is entitled to a replacement expert under these circumstances. But, as Plaintiffs made clear at the October 18 conference, the case law is also unequivocal that when an expert is replaced after the close of discovery, for whatever reason, the party replacing its expert is not entitled to a "do-over." Rather, the replacement expert's report must be limited to theories and opinions that are substantially similar to those outlined in the prior expert's report.

  Disregarding those clear limitations, the December 14, 2012 report of GT's replacement expert, Lucy Allen (also of NERA), abandons all of the radical theories and opinions expressed in Dunbar's report that were the subject of Plaintiffs' *Daubert* challenge. Instead, Allen asserts totally new opinions, theories and analyses that appear nowhere in Dunbar's report. In part, that totally new material is based on Allen's own event study and market model – neither of which Dunbar ever attempted to create. The new report also attempts to shore up the deficiencies in the expert report of GT's other NERA expert, William Taylor, which is the subject of a pending *Daubert* motion.[1] The manifest unfairness and undue prejudice to Plaintiffs of permitting Allen to abandon Dunbar's analyses and introducing completely new theories 11 years after this case commenced and more than four years after discovery closed is obvious. If allowed to stand, GT's new expert report would improperly place GT in a position far superior to the one it would have enjoyed had Dunbar not met an untimely death. As demonstrated below, that is precisely why the case law uniformly prohibits GT's belated efforts to remedy the obvious defects of its experts' analyses and limits the scope of a replacement expert's report to the same theories and

---

[1] Plaintiffs' *Daubert* motion challenging Taylor's report was filed on September 29, 2008 [Docket # 224].



analyses previously expressed. Accordingly, most of the Allen report must be stricken.

## I.    Dunbar's Largely Abandoned Expert Report

First and foremost, Dunbar did not do his own event study and market model. Rather, he accepted the market model of Plaintiffs' expert, Professor Gregg Jarrell, and did not dispute there were statistically significant stock price declines on the dates of corrective disclosures Jarrell identified. Rather, Dunbar merely questioned whether those disclosures were indeed corrective of GT's fraud. Ex. A at ¶¶ 71-141.[2] Dunbar also attacked the "materialization of concealed risk" damages theory expressed by Jarrell, primarily by making a lengthy legal argument that Jarrell's theory was inconsistent with the Supreme Court's *Dura* opinion on loss causation and asserting that the decline of the telecom market was an "intervening factor" that broke the causal chain between GT's fraud and the losses that Jarrell finds. *Id.* ¶¶ 26-35, 38-47. Dunbar also posed a radical "fraud-free counterfactual" in which he suggested that investors would have purchased "a similar security not affected by the fraud" in an attempt to demonstrate that GT's conduct caused no loss. *Id.* at ¶ 37. Dunbar further attacked Jarrell's reliance on Plaintiffs' accounting expert as the basis for Jarrell's assumption that GT should have issued an adverse opinion on Winstar's 1999 financial statements as "unsupportable and conceptually improper." *Id.* ¶¶ 48-58. To oppose Jarrell's conclusion that Winstar would have been forced into bankruptcy shortly after releasing 1999 financial statements that revealed the company's actual, fraud-free results, *Dunbar offered no opinion of his own.* Rather, he relied exclusively on the expert report of GT's other economics expert, William Taylor, for the unlikely proposition that Winstar could have obtained financing even if it had reported its true results and received a "going concern" letter from GT. *Id.* ¶ 59-61. In calculating damages, Dunbar relied on a novel and untested theory using a "revenue response co-efficient" that he concocted himself and which has never been accepted by a Court. *Id.* at ¶¶ 150-72; Ex. E at pp. 17-23.

Jarrell refuted Dunbar's attempts to explain away the corrective disclosures identified in Jarrell's event study. Ex. D at ¶¶ 35-86. Jarrell also exposed the mathematical flaws in Dunbar's damages theory and demonstrated that it was untested and unreliable and had never been subjected to peer review. *Id.* at ¶¶103-109. On September 29, 2008, Plaintiffs filed a *Daubert* motion to strike all of the Dunbar opinions discussed above, including Dunbar's decidedly uneconomical, legal attack on Jarrell's "materialization of concealed risk" damages theory.[3] While Dunbar's untimely death mooted the resolution of that motion, Allen's total abandonment

---

[2] The expert reports of Dunbar, Allen and Taylor and the rebuttal expert report of Jarrell are submitted as Exhibits A, B, C, and D, respectively in the Appendix attached to this letter and are each referred to as "Ex. __" herein.

[3] Plaintiffs' memorandum of law in support of their motion to strike the Dunbar report under *Daubert* is attached as Exhibit E to the Appendix. That memorandum demonstrates, among other things, that: (a) Dunbar's radical "fraud-free counterfactual" theory was unreliable because it improperly assumed away GT's fraudulent conduct, was never peer reviewed, was based on sheer speculation and had been specifically rejected by scholars as an appropriate gauge of causation and damages (Ex. E at 7-16); b) his novel revenue response coefficient method for calculating damages was never peer reviewed, yielded a statistically insignificant result, was based on an untested assumption of stock market inefficiency and reached the absurd conclusion that a negative revenue surprise would have prompted Winstar stock to *increase* in price (*id.* at 17-23); and c) his view that the Asensio corrective disclosures were not "new news" was based on his unorthodox and untested "information cascade" theory, which also assumed without proof that the market for Winstar *stock* was inefficient. *Id.* 29-31. It comes as no surprise that Allen has jettisoned all of these dubious theories, particular because the assumption of stock market inefficiency contradicts the economic realities and the Supreme Court's decision in *Basic v. Levinson*.


of Dunbar's radical theories is a powerful indication that they would never have survived Plaintiffs' *Daubert* challenge.

Jarrell also exposed the fatal flaws in Taylor's expert report. Jarrell refuted Taylor's opinions that the losses suffered by Winstar investors were solely the result of an industry-wide downturn in the telecom market during the class period and that Winstar would have gone bankrupt even in the absence of any fraud. Ex. D at ¶¶ 115-34. Jarrell also refuted Taylor's opinion that, had GT issued the adverse opinion that Plaintiffs' accounting expert says was warranted, Winstar would still have had access to the capital markets for financing. Specifically, Jarrell demonstrated that the two companies that received financing under financial duress that Taylor referred to in his report were totally inapposite to Winstar's situation. *Id.* at ¶ 133-34.[4] Relying almost entirely on Dunbar and Taylor's expert reports, GT filed a *Daubert* challenge to Professor Jarrell's opinions. That motion was denied in its entirety in September 2009.

## II. Allen's Expert Report Asserting Totally New and Different Theories and Opinions

Like Taylor and Dunbar (formerly), Allen is employed by NERA. Despite Allen's common ties to NERA, she abandons virtually all of the theories and analyses that Dunbar expressed in nearly 40 pages of his 72-page report.[5] Instead, Allen launches a completely new attack on Jarrell's opinions. GT authorized Allen to express her completely new opinions and analyses in an improper and misguided effort: (a) to cure the many obvious defects of Dunbar's report; (b) to bolster the opinions of GT's other expert, Taylor, that were soundly refuted by Jarrell; (c) to address the subsequent rulings of this Court and the Court of Appeals regarding loss causation; and (d) to otherwise respond to arguments raised in Plaintiffs' *Daubert* motions and Jarrell's rebuttal report.

In prevailing on their loss causation argument in the Court of Appeals and in supporting their class certification motion before this Court, Plaintiffs emphasized that Dunbar *never* performed his own event study (which necessarily would have included his own market model). While Allen attempts to disguise the bases of her own analyses, it is clear that, unlike Dunbar, she has developed her own market model and event study in which she claims to correct the alleged errors in Jarrell's study. *See* Ex. B at ¶¶ 76 (note 73), 82, 84, 135. Additionally, Allen's report contains the following entirely new theories and opinions attacking Jarrell's loss causation and damages theories that appear nowhere in Dunbar's report: 1) financing for CLECs and other telecom companies was more readily available at the beginning of the class period than at the end of that period (*id.* at p. 11-16, ¶¶ 20-33); 2) evidence of an academic study of firms with

---

[4] Among other things, Taylor opined that if GT "had issued a going-concern qualification or reported lower 1999 revenues for Winstar in March 2000, such a report would not have prevented Winstar from obtaining 'adequate financing to continue its business' or caused Winstar to file for bankruptcy and its stock price to fall to 'virtually zero' shortly following the March 10, 2000 release of Winstar's 1999 financial statements." Ex. C at ¶7. Taylor cites to two companies, Convergent Communications and e.spire, as examples to demonstrate this point. *Id.* at ¶¶ 72-80. Allen's discussion of financing available in the CLEC market and the cases involving Waste Management and Cendant (discussed below) is an obvious attempt to bolster Taylor's opinions, which cover the very same issues. *Id.* ¶¶ 20-43. Notably, except for his mere reference to Taylor's report, Dunbar's report covers none of this ground.

[5] Allen has completely abandoned Dunbar's novel revenue response co-efficient damages theory and his "fraud-free counterfactual" loss causation theory, while she reduces his multi-faceted legal argument against Jarrell's "Materialization of Concealed Risk" damages to a single paragraph. *See* Ex. B at ¶ 128.

3



financial restatements contradicts Jarrell (*id.* at p. 17, ¶¶ 34-35); 3) Cendant and Waste Management are examples of companies that were able to obtain new financing after revelations to the market of massive accounting frauds (*id.* at p. 17-19, ¶¶ 36-43); 4) Jarrell allegedly provides no support for the claim that revelation of the magnitude of Winstar's revenue misstatements would have driven the stock price to "virtually zero" if disclosed at the beginning of the class period (*id.* at p. 19-27, ¶ 44-61); and 5) Jarrell ignores changes in the market between the time of GT's alleged misconduct and the alleged curative disclosure period (*id.* at pp. 47-49, ¶¶ 117-22). Unlike Dunbar, Allen also attacks the methodology of Jarrell's event study. Specifically, she claims that his event study is "unreliable" because it does not have proper controls, including a supposed failure to adjust for changes in volatility. Allen at pp. 30-35, 53 ¶¶ 69-77, ¶ 133. She also claims that Jarrell's aggregate damages fail to account for short sellers and offsetting gains. *Id.* at pp. 53-55, ¶¶ 131-38. In addition, Allen provides her own "corrected" version of Jarrell's damages model to reduce the losses calculated by Jarrell. *Id.* at ¶ 141, n. 109. Dunbar made *none* of these points and his report did not contest the reliability of Jarrell's market model. Lastly, while Dunbar's estimated damages were based on his now-abandoned revenue response co-efficient theory, Allen's different damages calculations are based on an entirely new theory using her own market model. Ex. B at ¶¶ 135-38.

### III. All of the New Material in the Allen Report Described Herein Should Be Stricken Because it Exceeds the Permissible Scope of a Replacement Expert Report

In recognition of the manifest unfairness and substantial prejudice that would result from giving a party a second bite at the apple, courts have uniformly required that replacement experts' reports be limited to theories and opinions substantially similar to those expressed in the prior experts' reports. *See, e.g.*, *Whiteside v. State Farm Fire and Cas. Co.*, 2011 WL 5084981, at *1 (E.D. Mich. Oct. 26, 2011) (allowing new expert under Rule 16 after close of discovery where original expert became unavailable due to grave injuries in an accident and where defendant was diligent in securing a replacement and there was no prejudice to plaintiff because report would be "substantially similar"). In circumstances indistinguishable from those presented here, the court in *Lincoln Nat. Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2010 WL 3892860 (N.D. Ind. Sep. 30, 2010) held that the unavailability of defendants' original expert "does not provide [defendants] with carte blanche to generate an entirely new damages theory after approximately five years of litigation and less than six months from trial." *Id.* at *3-4. Accordingly, the *Lincoln* court allowed defendant to replace its expert witness who had been incarcerated after the close of discovery, but required that the replacement expert have a "similar area of expertise" and limited the new expert to addressing "the same subject matter" as the previous expert, without introducing new and different theories. *Id.* Similarly, courts in this Circuit and beyond routinely impose strict limitations on replacement expert reports to ensure (a) that the party replacing its expert is put in no better position than it would have enjoyed had its original expert not become unavailable, and (b) that replacing the expert does not produce an unfair advantage to that party. *See, e.g.*, *Doctor's Associates, Inc. v. QIP Holder LLC*, 2009 WL 5184404 (D. Conn. Dec. 23, 2009) (allowing substitution of expert after close of discovery because of a late-arising conflict of interest, but noting new expert's "***testimony at trial will be limited to establishing the veracity and integrity of [original expert] and the conclusions reached in [original expert's] original expert report.***") (emphasis added); *Adams v. Cooper Indus., Inc.*, 2007 U.S. Dist. LEXIS 99057, at *8 (E.D. Ky. Apr. 5, 2007) ("This substitution was intended to put the plaintiffs in as good a position as they would have held had [the prior expert]

4



performed his job as expected; it was not intended to allow the plaintiffs to designate a superior . . . expert after the deadline for expert disclosures.").

Where, as here, a party attempts to submit theories and opinions that go beyond those in its original expert's report, courts have not hesitated to strike those new matters from the replacement report. *See, e.g., Ind. Ins. Co. v. Valmont Elec., Inc.*, 2003 U.S. Dist. LEXIS 17176, at *1 (S.D. Ind. July 31, 2003) (allowing substitute expert for deceased expert, but excluding theories that were different from the deceased expert's); *Dennis v. Sherman*, 2010 U.S. Dist. LEXIS 106502, at *2 (W.D. Tenn. Oct. 4, 2010) (excluding testimony of substitute expert because it exceeded "the area and opinions disclosed and testified to by Plaintiff's original expert"); s*ee also Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 21 (D.P.R. 2009) (allowing defendant to replace expert who died after the close of discovery, but noting "[n]or will plaintiffs be surprised with new material [because] . . . Defendant has made clear that [the new expert] will testify on the same topics as Dr. Warner" and that "Defendant and plaintiffs are in agreement that no new subject matter will be addressed").

Here, a side-by-side comparison of the Dunbar and Allen reports is all that is required to see that GT seeks to evade all of the foregoing limitations by submitting a report with many opinions, theories and analyses that bear no resemblance to those put forth by Dunbar. If GT is awarded the complete "do-over" that the Allen report represents, Plaintiffs will be severely and unfairly disadvantaged because – by replacing Dunbar's defective opinions and theories, bolstering the opinions and theories of Taylor previously refuted by Jarrell, and requiring Plaintiffs to incur substantial legal and expert costs to respond to Allen's new opinions, theories and analysis – GT's new report will place GT in a far better position than it would have occupied had it been limited to the content addressed in the original, defective Dunbar report. To allow GT's replacement expert to make these new arguments more than four years after discovery closed, after Plaintiffs have revealed all of their arguments refuting the opinions of Dunbar and Taylor, and after Plaintiffs have prevailed on their loss causation arguments in the Court of Appeals will also unduly prejudice Plaintiffs by allowing GT to avoid the consequences of its own failed expert strategy. In effect, it will allow GT to place its bet on a race after it has already seen the results. It is hard to imagine a more unfair situation.

For all of the foregoing reasons, all of the portions of the Allen report identified herein should be stricken and her expert testimony should be limited to the opinions and analysis set forth in the remainder of her report. Plaintiffs respectfully request that this relief be granted immediately, so that Plaintiffs will not have to incur the substantial costs inherent in responding to Allen's new arguments in the Jarrell rebuttal report due on February 1, 2013.

Respectfully submitted,

Patrick L. Rocco /ams

cc: James Bernard, Esq. (via electronic mail)
Jonathan K. Levine, Esq. (via electronic mail)