**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WINSTAR COMMUNICATIONS SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>All Actions | Master File No.<br>01 Civ. 3014 (GBD) |
| JEFFERSON INSURANCE COMPANY OF NEW YORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM J. ROUHANA, JR.;<br>NATHAN KANTOR; RICHARD J. UHL;<br>and GRANT THORNTON LLP,<br><br>Defendants. | Case No. 01 Civ. 11522 (GBD) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**TO PRECLUDE CERTAIN TRIAL TESTIMONY OF LUCY P. ALLEN**

Ralph M. Stone
James P. Bonner
Patrick L. Rocco
STONE BONNER & ROCCO LLP
260 Madison Avenue, 17th Floor
New York, New York 10016

Daniel C. Girard
Jonathan K. Levine
GIRARD GIBBS LLP
601 California Street, Suite 1400
San Francisco, California 94108

*Lead Counsel for Class Plaintiffs and*
*Chair of Class Plaintiffs' Executive*
*Committee*

*Counsel for the Jefferson Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 3

I.   ALLEN'S TRIAL TESTIMONY SHOULD BE LIMITED TO PRESENTING
     AND DEFENDING THE MATERIAL FROM DUNBAR'S EXPERT REPORT
     THATSHE HAS ADOPTED .............................................................................. 3

II.  ALLEN SHOULD BE PRECLUDED FROM TESTIFYING CONCERNING THE
     NEW THEORIES, OPINIONS, ANALYSES AND DATA IN THE ALLEN
     REPORT THAT WERE NOT INCLUDED IN THE DUNBAR REPORT ........... 5

     A.  The Applicable Legal Standard ........................................................ 5

     B.  Allen's Report Improperly Includes New Opinions, Theories, Analyses, And
         Data That Have No Precedent In The Dunbar Report And Will Result In
         Prejudice To Plaintiffs If Not Stricken ............................................ 9

III. ALLEN SHOULD BE PRECLUDED FROM TESTIFYING TO HER
     ILLUSTRATIVE COMPUTATION CLASS PLAINTIFFS' STOCK
     DAMAGES ................................................................................................... 14

     A.  The Applicable Legal Standard ...................................................... 14

     B.  The Court Should Exclude Allen's Damages Computation Because She
         Incorrectly Assumes That The Jury Cannot Find GT Liable For A False Audit
         Opinion That Had The Effect Of Maintaining Winstar Securities At Inflated
         Prices  .............................................................................................. 16

     C.  The Court Should Exclude Allen's Damages Calculation Because She
         Impermissibly Seeks To Usurp The Jury's Role By Testifying That The Jury
         Must Find That Winstar's Continued Fraudulent Conduct In 2000 Constituted
         An Intervening Cause of Plaintiffs' Losses ..................................... 19

IV.  ALLEN SHOULD BE PRECLUDED FROM TESTIFYING TO HER
     IRRELEVANT LEGAL OPINIONS .............................................................. 25

CONCLUSION ............................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Cooper Indus., Inc.,*
    2007 U.S. Dist. LEXIS 99057 (E.D. Ky. Apr. 5, 2007) ........................................ 6

*Amorgianos v. Amtrak,*
    303 F.3d 256 (2d Cir. 2002)................................................................ 15

*Assaf v. Cottrell, Inc.,*
    2012 U.S. Dist. LEXIS 79662 (N.D. Ill. June 5, 2012) ............................... 5, 8, 13

*Assaf v. Cottrell, Inc.,*
    2012 U.S. Dist. LEXIS 9243 (N.D. Ill. Jan. 26, 2012) ......................................... 6

*Baumann v. Am. Family Mut. Ins. Co.,*
    278 F.R.D. 614 (D. Colo. 2012) ........................................................... 5

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996).................................................................. 15

*Cardiac Science, Inc. v. Koninklijke Philips Elecs. N.V.,*
    2006 U.S. Dist. LEXIS 93833 (D. Minn. Dec. 22, 2006)................... 5,7, 8, 11, 13

*Castellano v. Young & Rubicam, Inc.,*
    257 F.3d 171 (2d Cir. 2001)............................................................... 21

*Cerbelli v. City of New York,*
    2006 U.S. Dist. LEXIS 69902 (E.D.N.Y. Sept. 27, 2006).................................. 23

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (U.S. 1993)............................................................... *passim*

*Doctor's Assocs., Inc. v. QIP Holder LLC,*
    2009 WL 5184404 (D. Conn. Dec. 23, 2009)..............................................3-4, 7-8

*Dunkin' Donuts Inc. v. N.A.S.T., Inc.,*
    2005 U.S. Dist. LEXIS 16703 (N.D. Ill. Aug. 10, 2005)...........................5-7, 8-13

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (U.S. 2005)............................................................... 21, 25

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,*
    343 F.3d 189 (2d Cir. 2003)............................................................21-23

*Exxon Co., U.S.A. v. Sofec, Inc.,*
    517 U.S. 830 (U.S. 1996)................................................................. 22

*FindWhat Investor Group v. FindWhat.com*,
  658 F.3d 1282, 1317 (11th Cir. 2011) ............................................................ 18

*Grant Thornton, LLP v. F.D.I.C.*,
  435 Fed.Appx. 188 (4th Cir. 2011) ................................................................ 24

*Humphrey v. Diamant Boart, Inc.*,
  556 F. Supp. 2d 167 (E.D.N.Y. 2008) ............................................................ 14

*Indiana Ins. Co. v. Valmont Elec., Inc.*,
  2003 U.S. Dist. LEXIS 17176 (S.D. Ind. July 31, 2003).............................5-7, 10

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F.Supp.2d 148 (S.D.N.Y. 2008)............................................................... 21

*In re Leslie Fay Co. Sec. Litig.*,
  918 F.Supp. 749 (S.D.N.Y. 1996) .................................................................. 22

*In re Lupron Mktg. and Sales Practices Litig.*,
  295 F.Supp.2d 148 (D. Mass. 2003) ............................................................... 21

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F.Supp.2d 512 (S.D.N.Y. 2011)............................................................... 18

*In re Winstar Commc'ns*,
  U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 27, 2006) .............................................. 20

*Karnauskas v. Columbia Sussex Corp.*,
  2012 U.S. Dist. LEXIS 8988 (S.D.N.Y. Jan. 24, 2012)....................................... 15

*Kerman v. City of New York*,
  374 F.3d 93 (2d Cir. 2004)....................................................................20-21, 24

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*,
  14 F.Supp.2d 391 (S.D.N.Y. 1998) ........................................................... 22, 25

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (U.S. 1999).............................................................................. 14

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
  2010 U.S. Dist. LEXIS 103744 (N.D. Ind. Sept. 30, 2010)....................... 5-6, 8, 10

*Lippe v. Bairnco Corp.*,
  249 F.Supp.2d 357 (S.D.N.Y. 2003)....................................................... 7, 10, 13

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
  387 F.Supp.2d 794 (N.D. Ill. 2005) ........................................................... 19, 24

*Luizzi v. Pro Transp., Inc.*,
    2011 U.S. Dist. LEXIS 46862 (E.D.N.Y. May 2, 2011) ...................................... 23

*Malley v. Briggs*,
    475 U.S. 335 (U.S. 1986).................................................................................... 20

*MasterCard Int'l, Inc. v. First Nat'l Bank of Omaha*,
    2004 U.S. Dist. LEXIS 2485 (S.D.N.Y. Feb. 23, 2004)....................................... 16

*Morel v. Daimler-Chrysler Corp.*,
    259 F.R.D. 17 (D.P.R. 2009) ................................................................................ 5

*Nelson v. Tenn. Gas Pipeline Co.*,
    243 F.3d 244, 250 (6th Cir. 2001) ...................................................................... 13

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005).................................................................................. 16

*Nisanov v. Black & Decker (U.S.) Inc.*,
    2008 U.S. Dist. LEXIS 27044 (E.D.N.Y. Apr. 2, 2008) ................................ 14, 15

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000).................................................................................. 21

*Southard v. United Reg'l Health Care Sys., Inc.*,
    2008 U.S. Dist. LEXIS 87599 (N.D. Tex. Aug. 5, 2008).............................. 19, 25

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994)................................................................................ 23, 25

*United States ex rel. Suter v. Nat'l Rehab Partners Inc.*,
    2007 U.S. Dist. LEXIS 70952, at *4-5 (D. Idaho Sept. 24, 2007) ........................ 1

*Warner v. Orange County Dep't of Probation*,
    115 F.3d 1068 (2d Cir. 1997)......................................................................... 20-21

*Whiteside v. State Farm Fire & Cas. Co.*,
    2011 U.S. Dist. LEXIS 123978 (E.D. Mich. Oct. 26, 2011) ................................. 5

*Wortley v. Camplin*,
    333 F.3d 284 (1st Cir. 2003)................................................................................ 22

**Statutes and Rules**

Fed. R. Evid. 104(a) ........................................................................................................... 14

Fed. R. Evid. 403 ................................................................................................................ 15

Fed. R. Evid. 702 ................................................................................................................ 14

*Restatement (2d) of Torts* § 548A ..................................................................................... 21

The Class and Jefferson Plaintiffs (together, "Plaintiffs") respectfully submit this memorandum of law in support of their motion: (1) to preclude Lucy P. Allen, defendant Grant Thornton LLP's ("GT") replacement damages and loss causation expert, from testifying at trial concerning all new theories, opinions, analyses and data in her expert report ("Allen Report") that were not included in the prior expert report of Frederick C. Dunbar ("Dunbar Report");[1] (2) to preclude Allen from testifying at trial concerning:  (a) the illustrative damages computation included at paragraphs 134 to 138 of the Allen Report, and (b) the improper legal opinions expressed at paragraphs 128, 129 and footnotes 107 and 108; and (3) for an award of costs and expenses, including attorneys fees, incurred in moving to preclude the aforementioned portions of the Allen Report.[2]

## INTRODUCTION

GT retained Lucy P. Allen of the consulting firm NERA Economic Consulting to replace her colleague, Frederick C. Dunbar, as GT's damages and loss causation expert in this matter following Dunbar's passing.  Faced with Plaintiffs' compelling attack upon the unprecedented, illogical opinions that Dunbar expressed in his expert report and deposition and Plaintiffs' unresolved *Daubert* motion with respect to those opinions, GT elected to abandon nearly all of his analyses and attempt a "do-over" by means of Allen's replacement expert report.  Having pursued this strategy, Allen is now limited to testifying in conformity with the limited portion of the Dunbar Report that she has not abandoned.

---

[1] The improper expansive scope of Allen's replacement expert report was previously raised in an informal motion to strike addressed in letters to the Court.  The Court denied that motion without prejudice, granting Plaintiffs permission to file a formal motion after Ms. Allen's deposition.

[2] *United States ex rel. Suter v. Nat'l Rehab Partners Inc.*, 2007 U.S. Dist. LEXIS 70952, at *4-5 (D. Idaho Sept. 24, 2007) (when plaintiff sought to take advantage of substitution of expert to submit completely revised expert opinions, plaintiff was required to pay all attorneys' fees and expert expenses incurred by the defendant as a result of the substitution).

Courts have continually barred parties from seeking to advance their litigation interests by capitalizing upon unusual circumstances (such as a death) requiring the retention of a replacement expert to alter substantially the opinions expressed by the initial expert. That approach adheres to the rules governing the timing of expert disclosures and challenges to the admissibility of expert opinions. The prohibitions upon do-overs such as the Allen Report also preserve basic principles of fairness. In that regard, courts taken steps to avoid the prejudice caused by allowing a party to redo its expert disclosures *after* its opponent has undertaken the expense of rebutting the initial disclosures, thereby revealing their trial strategy.

Allen's replacement testimony ignores all of these principles. Allen has jettisoned virtually all of Dunbar's analyses. She offers entirely new opinions, challenges aspects of the testimony of Plaintiffs' damages and loss causation expert (Professor Gregg A. Jarrell) that Dunbar never criticized, and develops an entirely new (far lower) estimate of Class Plaintiffs' damages based upon data and theories different from those that Dunbar described. Case law demonstrates that GT cannot alter its expert testimony so dramatically at this late date. Accordingly, the Court should bar Allen from testifying regarding the entirely new matters addressed in paragraphs 20-61, 65-77, 82, 117-22, 131-141 of her report.

Even if Allen's proposed testimony did not depart so dramatically from Dunbar's opinions, her testimony would be inadmissible in three important respects under *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993). In calculating Class Plaintiffs' damages with respect to the one "corrective disclosure" that Allen considers, Allen makes two fundamental legal errors that render her opinions irrelevant. First, she assumes that GT cannot be held liable for all of the damages flowing from its false audit opinion because that opinion related, in part, to three financial quarters of results that Winstar Communications, Inc. ("Winstar" or the "Company") announced prior to disclosing its audited financial results. Contrary to Allen's

view, however, courts have uniformly recognized that juries may find defendants liable for false statements that maintain inflation in the price of a company's stock, including audit opinions that relate to the accuracy of previously announced financial results.  Accordingly, the Court must strike Allen's opinions regarding the quantum of Class Plaintiffs' damages because they are based on her erroneous assumption that GT cannot be held liable for damages flowing from GT's maintenance of inflation in the price of Winstar's securities by means of the audit opinion.

GT's proposal that Allen be permitted to testify that GT cannot be found liable for damages that arise, in part, from Winstar's continuation of its fraud in 2000 (the year after the financial results that GT audited) exhibits similar flaws that render her testimony inadmissible under *Daubert*.  Specifically, Allen's opinions in that regard seek to invade the province of the jury by "expertising" the fact-specific issue of whether Winstar's ongoing fraudulent conduct during 2000 constituted a foreseeable consequence of GT's fraudulent failure to disclose the Winstar fraud in connection with the 1999 audit.  Because only the jury can make that fact-specific determination, and Allen brings no expertise to bear on the foreseeability issue, her damages opinions are inadmissible for this additional reason.

Lastly, the Court should preclude Allen from testifying about irrelevant legal theories that exceed the scope of her expertise and purport to usurp the Court's role in instructing the jury.

## ARGUMENT

I. **ALLEN'S TRIAL TESTIMONY SHOULD BE LIMITED TO PRESENTING AND DEFENDING THE MATERIAL FROM DUNBAR'S EXPERT REPORT THAT SHE HAS ADOPTED**

Allen is an employee of NERA Economic Consulting, as was Dunbar.  *See* Ex. A (Allen Rpt) at ¶ 3[3]; Ex. C (Allen Deposition Tr.) at 347:15-348:13; Ex. B (Dunbar Rpt) at ¶ 6.  When Dunbar died, "[NERA] could simply have assigned another expert to [GT's] case in order to

---

[3] Citations to "Ex. __" refer to the exhibits to the Declaration of Patrick L. Rocco.

support the conclusions reached in [Dunbar's] original report.  Instead, [GT] commissioned [Allen's] preparation of an entirely new expert report using a different analysis and reaching a damages amount [tens of millions of dollars lower] than that reached by [Dunbar]." *Doctor's Assocs., Inc. v. QIP Holder LLC*, 2009 WL 5184404, at *13-14 (D. Conn. Dec. 23, 2009).  The fact that GT took advantage of the death of its damages expert to undertake a "do over" was confirmed by Allen's testimony that her assignment in this case was to reinvent the wheel:

> [M]y assignment in this case was essentially to take over the assignment that Dr. Dunbar had done, which was to review the analysis of plaintiff[s'] expert…. I wasn't particularly asked to review the analysis of Dr. Dunbar. I was asked to take over the same assignment that Dr. Dunbar had originally been asked to … do.

Ex. C at 138:25-139:10.  Indeed, Allen did not even review Dunbar's data.  *See id.* at 138:14-23.

Under identical circumstances, *Doctor's Assocs.* court "substantially limited" the scope of testimony that a replacement expert (and co-worker of the original expert) could give at trial, restricting him "to establish[ing] the veracity and integrity of [the original expert] and the conclusions reached in [the original expert's] original expert report." *Doctor's Assocs., Inc.*, 2009 WL 5184404, at *14.  The Court should apply the same limitation here, especially in light of Allen's deposition testimony that:  prior to Dunbar's death, she had worked with him on "a lot" of matters including securities fraud litigations (*see* Ex. C at 347:15-348:8); she does not reject any of the theories expressed in his report (*see id.* at 139:11-15); and she and Dunbar reached the same conclusions, including that Plaintiffs suffered no loss (*id.* at 139:19-140:7, 141:9-10, 141:14-142:17).  Given that Allen "has not provided any indication that [Dunbar's] original report – which he prepared on behalf of [Allen's employer, NERA] – was inaccurate, or that [Dunbar] lacked integrity in any way," no prejudice to GT would arise if Allen's trial testimony were limited to "present[ing] and defend[ing] [Dunbar's] original expert opinion," to the extent she has not already abandoned it. *Doctor's Assocs.*, 2009 WL 5184404, at *11, 14.

Importantly, however, GT and Allen elected to rely exclusively upon Allen's new theories, opinions, analyses and data, rather than those of Dunbar, even after Plaintiffs pointed out that case law prohibited replacement experts from acting in that manner. As a result, the Court should not permit Allen to testify concerning theories, opinions and analyses in the Dunbar Report that do not appear in the Allen Report. Rather, Allen should be limited to testifying only about the subject-matter addressed in the portions of the Allen Report that are not the subject of the instant motion.

## II. ALLEN SHOULD BE PRECLUDED FROM TESTIFYING CONCERNING THE NEW THEORIES, OPINIONS, ANALYSES AND DATA IN HER REPORT THAT WERE NOT INCLUDED IN THE DUNBAR REPORT

### A.   The Applicable Legal Standard

In recognition of the manifest unfairness and substantial prejudice that would otherwise result, courts uniformly limit the reports and testimony of eleventh-hour replacement experts "to the subject matter and theories already espoused by the former expert." *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 103744, at *11 (N.D. Ind. Sep. 30, 2010) (permitting substitution five-and-a-half months before trial on condition that replacement expert would "only be permitted to address the same subject matter as the previous expert without making any meaningful changes"); *Cardiac Science, Inc. v. Koninklijke Philips Elecs. N.V.,* 2006 U.S. Dist. LEXIS, at *11, 13 (D. Minn. Dec. 22, 2006) (permitting substitution four months before trial upon "strict[]" compliance with conditions that replacement expert "may not testify in any manner that is contrary to or inconsistent with [the original expert]" in order "[t]o minimize the inevitable prejudice to [opponent] caused by the substitution").[4]

---

[4]   *See also, e.g., Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 2005 U.S. Dist. LEXIS 16703, at *7 (N.D. Ill. Aug. 10, 2005) (precluding replacement expert's report that contained additional factual assertions and different opinions "from playing any role in th[e] litigation," and allowing replacement expert only "to provide testimony that conforms precisely to the [original expert's] report (but *not* beyond, or in contravention of, that report)" (emphasis in original);

Allowing a party to substitute a new expert when its original expert has become unavailable for reasons beyond the party's control is "'intended to put [that party] in as good a position as they would have held had [its unavailable expert] performed his job as expected; it [is] not intended to allow [that party] to designate a superior . . . expert after the deadline for expert disclosures.'" *Lincoln Nat'l*, 2010 U.S. Dist. LEXIS 103744, at *7 (quoting *Adams v. Cooper Indus., Inc.*, 2007 U.S. Dist. LEXIS 99057, at *8 (E.D. Ky. Apr. 5, 2007)).  Moreover, limiting the replacement expert to the original expert's opinions, theories, methodologies and data is intended to prevent the party that is replacing its expert from benefitting unfairly from the knowledge it has by then obtained about its opponent's trial strategy.  *See Assaf v. Cottrell, Inc.*, 2012 U.S. Dist. LEXIS 9243, at *12-13, 21 n.63 (N.D. Ill. Jan. 26, 2012) ("*Assaf I*") (recognizing prejudice to defendant if plaintiff's replacement expert were permitted to testify other than "'in strict conformity'" with original expert's report because plaintiff could have used insights gained into defendant's case, from defendant's deposition questioning of the original expert and arguments in *Daubert* and summary judgment motions, to its benefit in securing the replacement expert) (quoting *Dunkin' Donuts.*, 2005 U.S. Dist. LEXIS 16703, at *2).

Thus, to ensure that the party proffering a replacement witness does not gain an unfair litigation advantage, courts have precluded replacement experts from:

---

*Assaf v. Cottrell, Inc.*, 2012 U.S. Dist. LEXIS 79662, at *9 (N.D. Ill. June 5, 2012) ("*Assaf II*") (striking portion of replacement safety expert's report that was not "confined to [the] original expert's findings" in that it "describe[d], in detail, the need for warning labels and training" which was only "mention[ed]" in the original expert's report); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 22 (D.P.R. 2009) (restricting replacement expert's testimony to "the same subject matter as [the original expert] without meaningful changes"); *Whiteside v. State Farm Fire & Cas. Co.*, 2011 U.S. Dist. LEXIS 123978, at *5 (E.D. Mich. Oct. 26, 2011) (finding no prejudice only because replacement expert's "findings will be substantially similar to" the original expert's with no "new findings or opinions"); *Baumann v. Am. Family Mut. Ins. Co.*, 278 F.R.D. 614 (D. Colo. 2012) (barring any "'meaningful change in testimony'" and emphasizing that the new expert's opinion "should not stray from the subject matter" of original expert's opinion, and that, "[t]o the extent that [new expert] covers *new material* . . . Defendant may file a motion to exclude that portion of [his] opinion"); *Indiana Ins. Co. v. Valmont Elec., Inc.*, 2003 U.S. Dist. LEXIS 17176, at *4 (S.D. Ind. July 31, 2003) (replacement expert must "'have a similar area of expertise and … express only opinions like those previously held by the deceased expert'").

- *contradicting the opinions and conclusions espoused by the original expert*:  *Cardiac Science,*  2006 U.S. Dist. LEXIS 93833, at *10, 12 (replacement expert "may not testify in any manner that is contrary to or inconsistent with [the original expert]" and "must reach the same conclusions as [the original expert] did"); *Dunkin' Donuts*, 2005 U.S. Dist. LEXIS 16703, at *7 (permitting replacement expert only "to provide testimony that conforms precisely to [the original expert's] report (but *not* beyond, or in contravention of, that report") (emphasis original);

- *adding new findings or opinions not included in the original expert's report*:  *Cardiac Science,*  2006 U.S. Dist. LEXIS 93833, at *10, 12 (replacement expert "is limited to the opinions properly disclosed in [the original expert's] opening expert report"); *Morel*, 259 F.R.D. at 22 ("restricting [replacement expert's] testimony to the areas covered by [the original expert] … without meaningful changes"); *Dunkin' Donuts*, 2005 U.S. Dist. LEXIS 16703, at *3 (excluding as "reinvent[ing] the wheel" the report of replacement expert that expressed different opinions from the original expert's report); *Doctor's Assocs.,* 2009 U.S. Dist. LEXIS 119949, at *13 (excluding report of plaintiff's replacement damages expert that "concluded that [plaintiff] suffered damages in an amount approximately $1.7 million higher than the amount calculated by [plaintiff's original damages expert]");

- *using new theories or methodologies not relied upon by the original expert*:  *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 385 (S.D.N.Y. 2003) (denying plaintiffs' motion to substitute their two business valuation experts with a new expert whose report "discusse[d] three new [valuation] theories not relied on by [plaintiffs' original experts]"); *Indiana Ins.*, 2003 U.S. Dist. LEXIS 17176, at *4 (excluding two accident

causation theories expressed by replacement expert that "were different from any theories espoused by [the original expert]"); *Doctor's Assocs.,* 2009 U.S. Dist. LEXIS 119949, at *14 (excluding report of replacement damages expert who used a different analysis from the original damages expert); *Lincoln Nat'l*, 2010 U.S. Dist. LEXIS 103744, at *10 ("The unavailability of [the original expert] does not provide [defendant] with *carte blanche* to generate an entirely new damages theory after approximately five years of litigation and less than six months from trial.");

- *relying upon data or factual information not referenced in the original expert's report*: *Dunkin' Donuts*, 2005 U.S. Dist. LEXIS 16703, at *3 (excluding replacement expert who included additional factual assertions not included in original expert's report); *Cardiac Science,* 2006 U.S. Dist. LEXIS 93833, at *12 (in a patent infringement case, limiting replacement expert's testimony to only those instances of prior art that were included in the original expert's opening report); *Lippe,* 249 F.Supp.2d at 385 (S.D.N.Y. 2003) (denying plaintiffs' motion to substitute where replacement expert's "opinion … depend[ed] on additional data not relied on by [plaintiffs' original valuation experts]"); or

- *expanding upon findings and conclusions that were merely mentioned in the original expert's report*:  *Assaf II*, 2012 U.S. Dist. LEXIS 79662, at *9 (striking portions of replacement safety expert's report "that describe[d], in detail, the need for warning labels and training" that was "only mentioned" in the original expert's report; *Cardiac Science,* 2006 U.S. Dist. LEXIS 93833, at *11 ("[T]he Court encourages the parties to think of [the original expert's] testimony as contained in a three-inch electrode pad.  [The replacement expert's] testimony must also fit into that pad; his testimony cannot enlarge the pad into a four-inch electrode pad.").

**B.**    **Allen's Improperly Proposes To testify Regarding New Opinions, Theories, Analyses, And Data That Have No Precedent In The Dunbar Report**

Allen's report is replete with entirely new opinions, theories, analyses and data that did not appear in Dunbar's report or his deposition testimony. See Ex. D (Declaration of Gregg A. Jarrell) at ¶¶ 4-8; Ex. E (Rebuttal Report of Gregg A. Jarrell) at ¶¶ 11, 14, 18, 31 n.22, 34 n.29, 62, 159, 166-67. Permitting Allen to offer this entirely new testimony badly prejudices Plaintiffs, who devised their strategy for this litigation and constructed their own expert analyses in reliance upon the completeness the disclosures made in expert reports issued by GT nearly five years ago. As the foregoing cases recognized, it is simply unfair to Plaintiffs to permit GT a do-over of its expert analyses years after that discovery was due.

**Allen's New Damages Testimony Based Upon Her New Modification of Jarrell's Event Study and Market Model.** In light of that precedent, the Court must prohibit Allen from introducing her entirely new proposed testimony concerning Plaintiffs' supposed stock losses using an event study and market model and a single curative disclosure. *See* Ex. A at ¶¶ 134-38. Dunbar did not use an event study or market model to calculate Plaintiffs' losses. Instead, he used his novel and untested "revenue response co-efficient" damages theory. *See* Ex. B at ¶¶ 150-72; Ex. E at ¶¶ 11, 62. Dunbar's methodology also differed from Allen's in that his computation included all six curative disclosures alleged by Plaintiffs. *See* Ex. B at ¶¶ 150-72; Ex. E at ¶¶ 150-172. Allen's abandonment of Dunbar's novel damages theory is hardly surprising given that, by the time it engaged Allen, GT had the benefit of Jarrell's devastating critique of Dunbar's damages theory and Plaintiffs' arguments in support of their motion to strike the Dunbar Report. *See* Ex. E at ¶¶ 103-109; Memorandum of Law in Support of Plaintiffs' Motion to Strike The Expert Opinions of Frederick C. Dunbar dated September 29,

2008 [Docket # 224].[5]  Courts have consistently prohibited replacement experts from engaging in indistinguishable efforts to testify to different damages numbers than those devised by original experts[6] using a damages theory and a computation method not used by the initial expert.  *See, e.g., Doctor's Assocs., Inc.*, 2009 U.S. Dist. LEXIS 119949, at *14; *Lincoln Nat'l.*, 2010 U.S. Dist. LEXIS 103744, at *10; *Lippe,* 249 F.Supp.2d at 385; *Indiana Ins. Co.*, 2003 U.S. Dist. LEXIS 17176, at *4.

### Allen's Entirely New Criticisms of Jarrell's Event Study and Market Model.

Similarly, the Court should strike the entirely new opinions that Allen offers that criticize Jarrell's event study and market model.  *See* Ex. A at ¶¶ 65-77, 82, 117-22, 131-38.  Dunbar never once contested the reliability of Jarrell's market model and his only criticism of Jarrell's event study was to question whether the disclosures alleged by Plaintiffs were corrective.  *See* Ex. B at ¶¶ 71-141; Ex. E at ¶ 62.  By contrast, Allen's Report includes new opinions to the effect that:  (a) Jarrell's event study is "unreliable" because it does not have proper controls, including a supposed failure to adjust for changes in volatility (*see* Ex. A at ¶¶ 69-77, ¶ 133); and (b) Jarrell's market model ignores changes in the market and the CLEC industry that occurred

---

[5]  Plaintiffs' memorandum of law in support of their motion to strike the Dunbar report demonstrates, among other things, that: (a) Dunbar's radical "fraud-free counterfactual" theory was unreliable because it improperly assumed away GT's fraudulent conduct, was never peer reviewed, was based on sheer speculation and had been specifically rejected by scholars as an appropriate gauge of causation and damages (Docket # 244 at 7-16); (b) Dunbar's novel revenue response coefficient method for calculating damages was never peer reviewed, yielded a statistically insignificant result, was based on an untested assumption of stock market inefficiency and reached the absurd conclusion that a negative revenue surprise would have prompted Winstar stock to *increase* in price (*id.* at 17-23); and (c) Dunbar's view that the Asensio corrective disclosures were not "new news" was based on his unorthodox and untested "information cascade" theory, which also assumed without proof that the market for Winstar stock was inefficient. *Id.* 29-31.   It comes as no surprise that Allen has jettisoned all of these dubious theories, particular because the assumption of stock market inefficiency contradicts the economic realities and the Supreme Court's decision in *Basic v. Levinson*.

[6]  Dunbar opined that Plaintiffs' stock losses were $0.68 per share ($28-$33 million in aggregate).  *See* Ex. B at ¶¶ 171-72.  Allen opines, hypothetically and "for the sake of illustration," that Plaintiffs' stock losses are a fraction of that amount:  $0.15 per share ($5.6-$8 million in aggregate).  *See* Ex. A at ¶¶ 136-38.  If Allen were permitted to testify to her opinion that Plaintiffs' damages are one-fifth to one-quarter of what Dunbar computed, "the practical result of the substitution [will be] to put [Plaintiffs] in a significantly worse position than [they]would have been otherwise…".  *Doctor's Assocs. Inc.*, 2009 U.S. Dist. LEXIS 119949, at *14 (precluding plaintiff's replacement damages expert from testifying to his opinion that plaintiff's damages were $1.7 million higher than calculated by plaintiff's original expert).

between GT's false clean audit opinion and the curative disclosure period.  *See id.* at ¶¶ 117-122.

These new opinions must be excluded.  *See, e.g., Cardiac Science, Inc.*, 2006 U.S. Dist. LEXIS

93833, at *11-12 (limiting replacement expert's opinions "to the opinions properly disclosed in

[the original expert's] opening expert report").

**Allen's Entirely New Assertion that the Reaction of Winstar Securities to the**

**March 8, 2001 Corrective Disclosure Was Statistically Insignificant.**  Allen also departs from

Dunbar's analysis by opining that the reaction of Winstar's stock price to the March 8, 2001

Ascensio Report was not statistically significant.  *See* Ex. A at ¶¶ 82, 135.  Dunbar did not

dispute that there were statistically significant stock reactions on the dates of all of the corrective

disclosures alleged by Plaintiffs.  *See* Ex. B at ¶¶ 71-141.  Indeed, Dunbar had no basis to dispute

Jarrell's opinions to this effect because Dunbar did not create a market model or make

adjustments to Jarrell's market model.  Hence, Allen's opinion that the price reaction to the

March 8, 2001 Ascensio Report was not statistically significant is new, and must be excluded.

*See e.g., Cardiac Science, Inc.*, 2006 U.S. Dist. LEXIS 93833, at *11-12.

**Allen's Entirely New Criticisms of Jarrell's Aggregate Damages Estimate.**  Allen

also departs from Dunbar's analyses by criticizing Jarrell's aggregate damages estimates for

failing to account for short sellers and offsetting gains.  *See* Ex. A at ¶¶ 139-141; Ex. E at ¶¶ 14,

166-67.  In contrast, Dunbar never questioned Jarrell's method of computing Plaintiffs'

aggregate damages.  Accordingly, the Court should also exclude this entirely new analysis.  *See*

*e.g., Cardiac Science, Inc.*, 2006 U.S. Dist. LEXIS 93833, at *11-12.

**The Entirely New Data that Allen Cites and Analyzes to Support GT's Criticisms of**

**Jarrell's Analyses.**  Finally, Allen seeks to introduce and rely upon an array of entirely new data

to bolster GT's criticisms of Jarrell's opinions that Winstar would have been unable to continue

in business, and its stock price would have fallen to virtually zero, absent GT's false clean audit

opinion.  *See* Ex. A at ¶¶ 20-61.  Dunbar's critique of Jarrell's opinions that Winstar would have

filed for bankruptcy, and its stock price would have fallen to virtually zero, shortly after March

2000 absent GT's false clean audit opinion is set forth in five paragraphs on a single page of

Dunbar's report.  In those paragraphs, Dunbar referenced without elaboration:  (a) his analysis

showing positive quarter-over-quarter revenue growth after adjustment of Winstar's revenues to

correct overstatement; (b) GT expert William Taylor's opinion that lower revenues, or even a

going concern opinion, in March 2000 would not have prevented Winstar from obtaining

financing; and (c) the increase in Winstar's total enterprise value over the 2000-2001 period.  *See*

Ex. B at ¶¶ 59-63.

In contrast, Allen's critique of the same Jarrell opinions occupies 42 paragraphs over 16

pages of her report.  In that entirely new analysis, Allen seeks to introduce the following new

subject matter that is absent from Dunbar's report:  (a) a survey of analyst commentary

purporting to show that "[t]he financing sentiment in the market in 1999 and early 2000 was very

positive compared to the second half of 2000 and 2001" (Ex. A at ¶¶ 23-26); (b) data and

analysis purporting to show that Lucent was "very active in financing telecom companies at the

beginning of the class period" but not the end (*id*. at ¶¶ 27-30); (c) data and analysis purporting

to show that "Winstar's closest peer, Netlink Communications, received more funding than

Winstar in 1998 and 1999 despite having lower revenues that Winstar" (*id.* at ¶¶ 31-33);

(d) Credit Suisse, Jeffries and Paine Weber analyst reports that Allen describes as providing

"empirical evidence contradict[ing]" Jarrell's claims (*id*. at ¶¶ 46-48); (e) supposed evidence that

analysts were focused on the "long term prospects of the Company – not on current revenues and

earnings" (*id*. at ¶¶ 49-51); (f) evidence that "analysts were not focused on current and past

revenues, but on other metrics, such as spectrum licenses, building rights, on-net lines and

bundles services" (*id*. at ¶¶ 52-61).  Because Dunbar never referenced any of this data in his

report or deposition testimony, Allen cannot reference it in her trial testimony.  *See, e.g., Dunkin'*
*Donuts Inc.*, 2005 U.S. Dist. LEXIS 16703, at *3; *Cardiac Science, Inc.*, 2006 U.S. Dist. LEXIS
93833, at *12; *Lippe,* 249 F.Supp.2d at 385 (S.D.N.Y. 2003) (denying plaintiffs' motion to
substitute where replacement expert's "opinion … depend[ed] on additional data not relied on by
[plaintiffs' original valuation experts]").[7]

    Importantly, GT cannot plausibly claim that it will be prejudiced if it is not permitted to
dramatically improve its position by introducing entirely new expert opinions, theories, analyses
and subject matters through Allen that Dunbar, GT and its counsel were required to disclose to
Plaintiffs more than four years ago.  The case law unambiguously prohibits such efforts to
transform a replacement expert into a mechanism for introducing entirely new material long after
an opposing party has revealed its trial strategy.  In contrast, permitting Allen to testify
concerning the entirely new theories, opinions and data that Dunbar never addressed, will
severely prejudice Plaintiffs by placing GT in a far better position than it would have occupied
had GT been limited to the original, defective Dunbar report.  *See Lippe*, 249 F.Supp.2d at 386
("'Fairness does not require that a [party] whose expert witness testimony has been found
inadmissible under *Daubert* be afforded a second chance to marshal other expert opinions and
shore up his case…'") (quoting *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir.
2001)).  Accordingly, this Court must preclude Allen from testifying about the new matters that
she addresses in paragraphs 20-61, 65-77, 82, 117-22, 131-141 of her report.

---

[7]  Even had Allen merely expanded on an issue summarily raised in the Dunbar report, her new testimony would
nonetheless have to be stricken as improper. *See, e.g.*, **Error! Main Document Only.**.*Assaf II*, 2012 U.S. Dist.
LEXIS 79662, at *9 (striking portions of replacement safety expert's report "that describe[d], in detail, the need for
warning labels and training" that was "only mentioned" in the original expert's report).

III.   **ALLEN SHOULD BE PRECLUDED FROM TESTIFYING TO HER ILLUSTRATIVE COMPUTATION OF CLASS PLAINTIFFS' STOCK DAMAGES**

A.   **The Applicable Legal Standards**

Federal Rule of Evidence 104(a) requires courts to rule upon "preliminary questions concerning … the admissibility of evidence," including the admissibility of expert opinion evidence.  Fed.R.Evid. 104(a).  "The burden of establishing the admissibility of the proffered expert testimony weighs on the proponent of that testimony."  *Nisanov v. Black & Decker (U.S.) Inc.*, No. 05 Civ. 5911, 2008 WL 906708, at *2 (E.D.N.Y. Apr. 3, 2008) (citing *Humphrey v. Diamant Boart, Inc.*, No. 06 Civ. 2771, 2008 WL 413801 (E.D.N.Y. Feb. 13, 2008) (collecting cases)).

To merit admission at trial, expert opinion evidence must be "'not only relevant, but reliable.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  As the *Kumho Tire* Court emphasized, Rule 702 imposes "a special obligation" upon a trial judge to "'ensure'" that these requirements are met.  *Id.*

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if
>
> (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  To qualify as relevant, expert testimony must "relate to an[] issue in the case" and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (internal quotations omitted).  As to reliability, the Second

Circuit has stated that "[t]o warrant admissibility … it is critical that an expert's analysis be reliable at every step," and to that end "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

In *Daubert,* the Supreme Court articulated the following four factors for "determining the reliability of an expert's reasoning or methodology:  (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Karnauskas v. Columbia Sussex Corp.*, 2012 U.S. Dist. LEXIS 8988, at *21 (S.D.N.Y. Jan. 24, 2012) (Daniels, J.) (citing *Daubert*, 509 U.S. at 593-94).  Daubert's gatekeeping requirement "make[s] certain that [the] expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire*, 526 U.S. at 152.  Thus, "expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions" that are "unrealistic" or "contradictory." *Nisanov v. Black & Decker (U.S.) Inc.,* 2008 U.S. Dist. LEXIS 27044, at *6 (E.D.N.Y. April 2, 2008) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Expert testimony must also pass muster under Rule 403, which provides that testimony "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…".  Fed.R.Evid. 403.  Both the Supreme Court and the Second Circuit have "noted the uniquely important role that Rule 403 has

to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citing, *inter alia*, *Daubert*, 509 U.S. at 595).  *Accord MasterCard Int'l, Inc. v. First Nat'l Bank of Omaha, Inc.*, 2004 U.S. Dist. LEXIS 2485, at *22 (S.D.N.Y. Feb. 23, 2004) ("Because of the danger that expert evidence will mislead the jury, a court weighing admissibility under Rule 403 exercises more control over experts than lay witnesses.") (citing *Daubert*, 509 U.S. at 595).

> **B.    The Court Should Exclude Allen's Damages Computation Because She Incorrectly Assumes That The Jury Cannot Find GT Liable For A False Audit Opinion That Had The Effect Of Maintaining Winstar Securities At Inflated Prices**

Allen asserts that "[t]here is no evidence of loss causation or that there are any alleged damages."  Ex. A at ¶ 133.  *See also* Ex. C at 251:25-252:6 ("I haven't seen any evidence of any damages, so no evidence that the price was inflated and no evidence that the price declined during the alleged class period was caused by curative information of the alleged fraud.").  Nevertheless, "for the sake of illustration," Allen purports to compute the damages of Winstar common stock purchasers *with respect to one of the six* material corrective disclosures that Jarrell identifies at $0.15 per share (or between $5.6 - $8.00 million on a class-wide basis.) *See* Ex. A at ¶¶ 133-38; Ex. C at 252:7-15.  The Court should exclude this testimony, which lacks any foundation in economics and is purely a product of Allen's baseless conjecture.

Allen calculates her $0.15 per share figure as follows.  She notes that GT audited Winstar's 1999 financial statements, but not the financial results issued by Winstar during the first three quarters of 2000, when the fraud at Winstar continued.  See Ex. A at ¶¶ 136-37.  Allen then observes that the 1999 annual financial statements that GT audited included three quarters

of financial results that Winstar announced prior to the end-of-year, audited financial statements. *Id.* at ¶ 137.

With these facts in mind, Allen slashes her estimate of Plaintiffs' stock purchase damages by employing two entirely erroneous assumptions that are contrary to well-established precedent. First, Allen assumes that GT cannot be held liable for losses suffered by stock purchasers to the extent that they result from fictitious revenue announced by Winstar in the first three quarters of 1999 because GT "only" audited the annual financial statements, and Winstar announced the results from the first three quarters prior to releasing the annual financial statements. *See* Ex. A at ¶ 137 (emphasizing that GT is not "responsib[le]" for losses resulting from price inflation related to the overstatements included in Winstar's financial statements for the first three quarters of 1999 because that inflation "was already incorporated in Winstar's stock price … before Grant Thornton's alleged wrong"). *See also* Ex. C at 267:12-268:12, 273:11-22.  Second, Allen assumes that GT cannot be held liable for losses related to the fictitious revenue announced by Winstar during the first three quarters of 2000 because GT did not audit those results.  Because Allen's opinions in this regard ignore controlling authority concerning materiality and loss causation, the Court should not permit her to deliver to the jury her opinions concerning a potential means for calculating the stock purchaser damages related to only one of the six corrective disclosures that Jarrell identifies.

Allen's first erroneous assumption renders her partial damages opinion inadmissible under *Daubert* because that opinion relies upon Allen's mistaken impressions regarding the materiality of misrepresentations that maintain securities prices at inflated levels.  Because Allen's opinion is contrary to law, it is irrelevant and inadmissible.

Contrary to Allen's legal assumption regarding the actionability of false statements that maintain securities prices at inflated levels, "Defendants whose fraud prevents preexisting

inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock price in the first instance." *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1317 (11th Cir. 2011) (reversing summary judgment on grounds that plaintiffs' expert's testimony that misrepresentations perpetuated pre-class period inflation of stock price raised genuine issues of material fact as to loss causation and damages); *accord, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512, 562 (S.D.N.Y. 2011) ("[A] statement can cause inflation by causing the stock price to be artificially maintained at a level that does not reflect its true value."). Indeed, "There is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation." *FindWhat.com*, 658 F.3d at 1316.

This principle of law complies with common sense. Had GT done what it was obligated to do – *i.e.,* issue an adverse opinion regarding the 1999 financial results as a whole – the inflation in Winstar's securities prices would have been eliminated in one fell swoop. *See, e.g., Id.* (false statements made at start of class period were actionable because, "[i]f the Defendants had revealed the truth [at the beginning of a Class Period], the market would have digested this information and the artificial inflation within MIVA's stock price would have dissipated.").[8] Because GT failed to take that required step, however, the price of Winstar's securities after the issuance of GT's fraudulent audit opinion remained at the same inflated levels that they maintained immediately prior to the publication of the audit opinion. Thus, Class members who purchased at any point after GT issued its fraudulent audit opinion were damaged by that false representation. *See id.* at 1307 (where defendants made false statement that had effect of maintaining inflated price of company's securities on the first day of a class period, "investors

---

[8]  *Accord* Ex. C at 277:6-17 (expressing no disagreement with the proposition that if GT's 1999 year-end audit had corrected Winstar's overstatement of revenues for the first three quarters of 1999, the artificial inflation caused by those overstatements would have dissipated in March 2000). *See also* Ex. F (Rebuttal Report of Gregg A. Jarrell dated February 15, 2013) at ¶ 163.

who purchased [the company's] stock during the Class Period and still held their stock when the truth came out at the end of the Class Period paid inflated prices for their investment – prices they would not have paid but for the defendant's purported fraud – and lost this inflationary overpayment when the revelation of the truth caused the market to drain the inflation from the stock price").

It bears emphasis that Plaintiffs do not argue that GT is somehow precluded from arguing that its audit opinion was not fraudulent, or that GT's fraud did not cause Plaintiffs' losses. Rather, *Daubert* prohibits Allen from providing a partial damages analysis to the jury that hinges upon the false legal assumption that GT cannot be found liable for damages resulting from a representation that had the impact of maintaining the inflation in Winstar's securities prices. Because Allen's opinion relies heavily on that patently false legal assumption, Allen's testimony falls well short of passing muster under *Daubert*. *See, e.g., United Reg'l Health Care Sys., Inc.*, 2008 U.S. Dist. LEXIS 87599 (N.D. Tex. Aug. 5, 2008) ("[W]here as here, the expert's opinion is based on an erroneous legal premise, it is appropriate to exclude such testimony."); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are irrelevant and inadmissible.  They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact.") (internal citations omitted).

### C. The Court Should Exclude Allen's Damages Calculation Because She Impermissibly Seeks To Usurp The Jury's Role By Testifying That The Jury Must Find That Winstar's Continued Fraudulent Conduct In 2000 Constituted An Intervening Cause Of Plaintiffs' Losses

As noted above, Allen also reduces the damages attributable to the one corrective disclosure for which she analyzes stock purchasers' losses by opining, in effect, that the continued fraud in which Winstar engaged during 2000 constituted an intervening and superseding cause of Plaintiffs' losses.  *See* Ex. A at ¶¶ 136-37; Ex. C at 265:14-277:5.  By

making that assumption, Allen seeks to reduce the damages attributable to the March 8, 2001

corrective disclosure by 50%. *See* Ex. A at ¶ 136. According to Allen, that reduction is

mandatory because Winstar recognized 50% of the fraudulent revenue that Plaintiffs have

identified in both 2000 and 1999, and GT only audited the 1999 results. *See* Ex. A at ¶¶ 136-37.

Thus, Allen eliminates this portion of the price drop from her share damages computation

because she believes that it "is not alleged to be the responsibility of Grant Thornton." *See id.* at

¶ 136.

      To the extent that Allen's damages testimony relies upon the false assumption that GT

cannot be found liable for damages that flow in part from concurrent causes – such as Winstar's

continued fraud – that testimony fails to satisfy *Daubert* for the same reasons that as Allen's

opinion regarding damages that arise from statements that maintain securities prices at inflated

levels. It is true that GT is not liable under Section 10(b) as a maker of Winstar's false 2000

quarterly financial announcements. *In re Winstar Commc'ns*, 2006 U.S. Dist. LEXIS, at *30

(S.D.N.Y. Feb. 27, 2006) at *30 ("Plaintiffs cannot **premise their causes of action** against GT on

the unaudited information contained in the quarterly financial statements.") (emphasis added).

Allen errs as a matter of law, however, by assuming that Plaintiffs cannot recover from GT all of

their losses that the jury determines to have been reasonably foreseeable consequences of GT's

false clean audit opinion. Like common law tortfeasors, violators of the federal securities laws

are "'"responsible for the natural consequences of [their] actions."' *Kerman v. City of New York*,

374 F.3d 93, 126 (2d Cir. 2004) (quoting *Warner v. Orange County Dep't of Probation*, 115 F.3d

1068, 1072 (2d Cir. 1997) (quoting *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986))). *See*

*generally, e.g., Dura,* 544 U.S. at 341, 344 (noting the roots of private federal securities actions

in the common law tort actions of deceit and misrepresentation).

      Thus, GT is responsible for all of the damages that the jury determines are a foreseeable

consequence of GT's fraudulent audit opinion. *See, e.g., Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 197 (2d Cir. 2003) ("We have often compared loss causation to the tort law concept of proximate cause, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.'") (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001)).  Moreover, courts have long recognized that "'[a defendant] may be held liable for those consequences attributable to reasonably foreseeable intervening forces, *including the acts of third parties*.'"  *Kerman*, 374 F.3d at 126-27 (quoting *Warner*, 115 F.3d at 1071) (emphasis added).[9]  Only when a causal event constitutes a truly independent, intervening cause of a plaintiff's loss is a defendant relieved from responsibility for the plaintiff's damages.  *See, e.g., Marbury Mgmt, Inc. v. Kohn*, 629 F.2d 705, 719 (2d Cir. 1980) (no liability for misrepresentation as to the financial condition of the issuer "'when the shares go down because of the sudden death of the corporation's leading officers,'" which is "'a subsequent event that has no connection with or relation to [the issuer's] financial condition'") (quoting *Restatement (2d) of Torts* § 548A at 107 (1977)); *In re Lupron Mktg. and Sales Practices Litig.*, 295 F.Supp.2d 148, 175 (D. Mass. 2003) (in order to break the chain of proximate causation, "the intervening act [must] be unforeseeable and completely independent of any act undertaken by the original actor.  (An arsonist, for example, is not relieved of liability by a fireman's intervening efforts to suppress the fire.").  In contrast, courts have long recognized that a defendant is responsible for *all* of the damages that arise from its actions *and* the actions of additional, concurrent causes.  *See, e.g., Semerenko v. Cendant Corp.*,

---

[9]  *Dura* is fully consistent with this well-established principle and provides no basis for disaggregating from Plaintiffs' recovery losses that are the foreseeable consequence of GT's securities law violations.  Rather, *Dura* only requires the disaggregation of losses caused by truly independent intervening events that break the chain of loss causation, *i.e.*, "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events."  *Dura*, 544 U.S. at 343.  *See e.g., In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 163 (S.D.N.Y. 2008) (loss causation is not pled by alleging a stock price drop that "might be the result of a market-wide downturn, an industry-specific phenomenon, *or other intervening events unrelated to the disclosure defect at issue*") (emphasis added).

223 F.3d 165, 186-87 (3d Cir. 2000) ("So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery."); *In re Leslie Fay Co. Sec. Litig.*, 918 F.Supp. 749, 758 (S.D.N.Y. 1996) (where multiple factors combine to produce plaintiffs' losses, *each* qualifies as a cause of *all* of the plaintiffs' damages).

Allen's damages opinion ignores these well-established damages principles and oversteps her bounds as an economics expert.  Allen does not purport to inform the jury that, *if* it determines that Winstar's ongoing fraud in 2000 constitutes an intervening cause of Class members' losses, it should reduce their damages by 50%.  Rather, Allen proposes to instruct the jury that – as a matter of law – GT can have no liability for damages that flow in part from Winstar's continuation of its fraudulent conduct in 2000.  *See* Ex. A at ¶ 136, Ex. C at 268:4-12.

By doing so, Allen violates *Daubert* because she purports to step in to the jury's shoes and decide the *factual* issue of what constitutes an intervening, superseding cause of Class members' losses that breaks the causal chain between GT's fraudulent audit opinion and the decline in the prices of GT securities in 2001.  The jury – not GT's expert – must decide this factual issue.  *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41 (1996) ("The issues of proximate causation and superseding cause involve application of law to fact, which is left to the fact finder, subject to limited review."); *Emergent Capital,* 343 F.3d at 197 (the presence of an intervening event is a matter for proof at trial); *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003) (in securities cases, "[p]roximate causation and intervening cause are usually issues for the jury to resolve").  Thus, Allen's testimony oversteps her permissible bounds as an expert by purporting to tell the jury how to decide a factual issue that falls squarely within the jury's province.  *See, e.g., Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 14 F.Supp.2d 391, 399 (S.D.N.Y. 1998) (excluding expert opinion that plaintiff acted reasonably in relying

upon the advice of counsel  because expert testimony cannot "'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it'" and opinion that plaintiff acted reasonably "'does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury'" rather than "'providing the groundwork in the form of an opinion to enable to jury to make its own informed determination'") (quoting *U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

As a result, Allen cannot express any opinion as to whether the ongoing Winstar fraud in 2000 constitutes a foreseeable consequence of GT's fraudulent audit opinion because Allen has no particular expertise or knowledge to bring to bear on this issue, which is committed to the experience and common sense of the jury.  *See, e.g., Luizzi v. State Nat'l Ins. Co.,* 2011 U.S. Dist. LEXIS 46862, at *18 (E.D.N.Y. May 2, 2011) (precluding expert testimony as to foreseeability of economic loss because jury would "come to their own conclusions about foreseeability after they [we]re given all of the relevant facts"); *Cerbelli v. City of New York*, 2006 U.S. Dist. LEXIS 69902, at *38-39 (E.D.N.Y. Sept. 27, 2006) (precluding expert testimony that the fatal shooting of the plaintiff was a foreseeable consequence of certain N.Y.P.D. procedures for interacting with emotionally disturbed people because foreseeability was "properly within the province of the fact-finder").

Indeed, Plaintiffs believe that the Court should determine at trial that Allen cannot testify that, *if the jury* should conclude that Winstar's ongoing conduct in 2000 was unforeseeable, the jury should reduce Class members' losses accordingly.  The proof at trial will demonstrate that Winstar continued to engage in precisely the same type of fraudulent transactions in 2000 that it employed in 1999, and it would not have been possible for Winstar to continue that conduct had GT fulfilled its obligation to render an unfavorable audit opinion.  When Plaintiffs prove those facts at trial, no reasonable jury will be able to conclude that it was unforeseeable that, having

obtained a clean audit opinion from GT for 1999, Winstar's management would continue to improperly recognize revenue from the same types of sham transactions in 2000. Indeed, a GT expert conceded in the context of a professional malpractice claim brought against GT by the Federal Deposit Insurance Commission that "it is certainly foreseeable from the standpoint of a reasonably prudent auditor that the failure to discover fraud will result in the continuation of the fraud." *Grant Thornton, LLP v. F.D.I.C.,* 435 Fed. Appx. 188, 195 (4th Cir. 2011) (affirming district court's finding that GT's negligent issuance of a clean audit opinion for an insolvent bank that had overstated its assets proximately caused the bank's post-audit net operating loss and rejecting GT's assertion that bank management's post-audit continuation of the pre-audit fraud constituted an intervening and supervening cause of the bank's losses); *see also Kerman* at 127 ("[t]he fact that the intervening third party may exercise independent judgment in determining whether to follow a course of action recommended by the defendant does not make acceptance of the recommendation unforeseeable or relieve the defendant of responsibility" for the resulting loss) (collecting authorities).

For present purposes, however, the salient point is that Allen cannot tell the jury how to resolve the issue of foreseeability, which is a quintessential factual issue reserved for the jury. As a result, Allen cannot opine that GT is not liable, under any circumstances, for losses partially related to Winstar's continued overstatement of its financial results in 2000. Accordingly, her limited damages opinion with respect to the March 8, 2001 corrective disclosure fails to satisfy *Daubert* for this additional reason because it contradicts well-established law concerning loss causation and concurrent and intervening causes of plaintiffs' losses. *See, e.g., United Reg'l Health Care*, 2008 U.S. Dist. LEXIS 87599 at *5 (expert opinion "based on an erroneous legal premise" does not satisfy *Daubert*); *Loeffel*, 387 F.Supp.2d at 806 ("Expert opinions that are contrary to law are irrelevant and inadmissible.").

IV.    **ALLEN SHOULD BE PRECLUDED FROM TESTIFYING TO HER IRRELEVANT LEGAL OPINIONS**

"'[T]he use of expert testimony is not permitted if it will usurp … the role of the trial judge in instructing the jury as to the applicable law…'" *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 14 F.Supp.2d at 399 (quoting *U.S. v. Duncan*, 42 F.3d at 101)).  For that reason, the Court must exclude Allen's opinions that Jarrell's materialization of concealed risk methodology does not comply with *Dura* (*see* Ex. A at ¶¶ 128, 129), and that Jarrell's inclusion of short-sellers' purchases in his damages calculations is contrary to law.  *See id.* at p.55 nn.107 and 108.  Moreover, the Court has already rejected GT's *Daubert* challenge of Jarrell on these grounds.  *See* Order Denying Motion Docket # 223 dated September 29, 2009 [Docket # 244].  Thus, no basis exists for Allen's efforts to inform the jury that Jarrell's opinions are contrary to law.

<u>**CONCLUSION**</u>

For all the foregoing reasons, Plaintiffs respectfully submit that this Court should issue an order:  (1) precluding Allen from testifying at trial concerning the new theories, opinions, analyses and data at paragraphs 20-61, 65-77, 82, 117-22, 131-141 of the Allen Report; and/or (2) (a) precluding Allen from testifying concerning her inadmissible opinions at paragraphs 134-138 and 128, 129 and footnotes 107 and 108 of the Allen Report, and (b) awarding Plaintiffs their costs and expenses incurred in responding to and moving to preclude the aforementioned portions of the Allen Report.

Dated:  March 15, 2013                                    Respectfully submitted,

STONE & BONNER & ROCCO LLP
By:        /s/ Patrick L. Rocco
            Ralph M. Stone
            James P. Bonner
            Susan M. Davies
260 Madison Avenue, 17th Fl.

New York, New York 10016
Telephone:  (212) 239-4340

*Lead Counsel for Class Plaintiffs*

GIRARD GIBBS LLP
By:      /s/ Jonathan K. Levine
        Daniel C. Girard
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:  (415) 981-4800

*Counsel for the Jefferson Plaintiffs*