USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: APR 17 2013

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE WINSTAR COMMUNICATIONS
SECURITIES LITIGATION

MEMORANDUM DECISION
AND ORDER

01 Civ. 3014 (GBD)

GEORGE B. DANIELS, United States District Judge:

> Before the Court is the Motion for Class Certification of Lead Plaintiffs BIM Intermobiliare SGR ("BIM"), Robert Ahearn, and DRYE Custom Pallets ("DRYE").  Plaintiffs allege that the accounting firm Grant Thornton ("GT") committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and made false and misleading statements in an audit opinion letter included in Winstar's 1999 Form 10-K filing.  Lead Plaintiffs seek to certify a class of "all persons and entities that purchased the common stock or publically traded bonds of Winstar . . . during the period from March 10, 2000 until April 2, 2001."  Pl. Mem. of Law in Support of Class Cert., ECF No. 141, at 1.  Lead Plaintiffs' motion is GRANTED, to the extent that this Court certifies a class of plaintiffs that includes purchasers of common stock from March 10, 2000 to April 2, 2001 and purchasers of certain bonds from October 16, 2000 to April 2, 2001.

## Background[1]

> Winstar was a rising telecommunications company that provided wireless broadband Internet connectivity to businesses.  Building its network was expensive, and Plaintiffs allege that

---

[1] A fuller account of the factual allegations in this case are set out in the Second Circuit's recent opinion, Gould v. Winstar Comms., Inc., 692 F.3d 148, 151-157 (2d Cir. 2012).  This decision only recounts the facts necessary to its outcome.

Winstar's expenses far exceeded its actual revenue in the late 1990s.  Plaintiffs allege that Winstar's management, in concert with its accountant GT, concealed this from current and potential investors through irregular accounting practices.[2]  These irregular accounting practices allegedly allowed Winstar to continue to raise money in the form of debt and equity to further build its network.

In 1999 and 2000, Winstar reported strong financial results that appeared to corroborate rosy statements by its management that the company was doing well.  Plaintiffs allege that these reported results were nothing more than the product of smoke, mirrors, and massive securities fraud.  Plaintiffs allege that Winstar manipulated its financial results via one-time, sparsely-documented equipment sales at the end of reporting periods, dubious bifurcated accounting methods that improperly recognized revenue too early, and "round-trip" transactions through which Winstar booked revenue that did not actually come in.

Plaintiffs' complaint concerns the unqualified audit opinion that was included in Winstar's publically filed 1999 10-k.  Plaintiffs allege that GT was "in" on all of Winstar's improper accounting schemes.  They allege that despite knowledge of and active participation in them, GT issued an audit opinion letter that stated that Winstar's 1999 financial statements accurately reflected its financial position, and complied with Generally Accepted Accounting Principles ("GAAP").  Plaintiffs claim that this audit opinion letter helped conceal that Winstar's revenue was overstated by over $400 million, and its expenses were understated by $600 million.  Although Winstar reported a net loss for 1999 of $1.5 billion, Plaintiffs claim that the true loss was in the neighborhood of $2.4 billion, and that had Winstar revealed its true financial health, it would never

---

[2] In addition to GT, Plaintiffs initially brought this suit against Winstar, Lucent Technologies Inc., and several of Winstar's officers and directors.  Winstar filed for bankruptcy protection in April 2001.  Plaintiffs reached a settlement with Lucent in 2004 and the officer and director defendants in 2006.

have been able to raise additional money, and would have gone bankrupt much sooner than it did in April, 2001.

There are currently three Lead Plaintiffs: BIM, Robert Ahearn, and DRYE.  BIM is an Italian asset management firm and wholly owned subsidiary of an Italian bank.  Pl. Mem. at 6.  BIM purchased Euro-denominated Winstar bonds (that are not the subject of this class certification motion) as well as common shares for its mutual funds.  It alleges that the funds suffered a loss of approximately four million dollars.  Shalov Reply Decl., ECF No. 190, Ballarini Depo., Ex L at 54.  Robert Ahearn is a Boston-based businessman who invested in Winstar shares on both his own behalf and in his capacity as administrator of two corporate profit sharing plans.  Pl. Mem. at 6.  Ahearn claims to have purchased Winstar common shares during the class period and suffered a loss of approximately $825,962.63.  Id. ¶ 6.  DRYE Custom Pallets is a Michigan corporation that made investments in Winstar shares through its corporate investment account.  DRYE claims that it purchased Winstar common shares during the class period and suffered a loss of approximately $586,042.00.  Id. ¶ 7.

Lead Plaintiffs seek a class composed of all purchasers of Winstar's common stock and certain U.S. dollar-denominated bonds from March 10, 2000 through April 2, 2001.  Throughout this period, Winstar's stock was publically listed on the NASDAQ exchange and there were over 85 million shares outstanding.  Shalov Decl., ECF No. 142, Ex. 3, Report of Candace L. Preston ("Preston Report"), ¶ 16.  Plaintiffs seek to include purchasers of three of Winstar's U.S. dollar-denominated bonds in their class: purchasers of the 12½% bonds due April 2008 (CUSIP 975515BD8), the 12¾% bonds due April 2010 (CUSIP 975515AY3), and the 14¾% bonds due

3

April 2010 (CUSIP 975515AZ0).[3]  These bonds were initially issued on March 27, 2000 as a

private placement pursuant to Rule 144A.[4]  Hakemi Decl., ECF No. 188, Ex. G, Affidavit of

Andrew S. Carron ("ASC1") ¶ 6.  They were rated B3/B-/B- by Moody's, Standard & Poor's, and

Fitch, respectively, which are below investment grade or "junk" ratings.  Id. ¶ 17.  The bonds were

initially not publically registered and had limited trading in relatively small numbers directly to a

few financial institutions.  The bonds were not publically registered until October 13, 2000, after

which the volume of bonds traded and number trades significantly increased.[5]

## Lead Plaintiffs Have Met the Requirements of Rule 23

Legal Standard

"The party seeking class certification bears the burden of establishing by a preponderance of

the evidence that each of Rule 23's requirements has been met."  Myers v. Hertz Corp., 624 F.3d

537, 547 (2d Cir. 2010).  This Court must undertake "a rigorous analysis" and resolve any relevant

factual disputes.  In re Am. Int'l. Grp. Secs. Litig., 689 F.3d 229, 238 (2d Cir. 2012).  The Rule 23

inquiry may overlap with that of the merits, although courts are not permitted to engage in "free-

ranging merits inquiries at the certification stage."  Dukes v. Wal-Mart Stores, 131 S. Ct. 2541,

2551 (2011); Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194 (2013).

---

[3] In addition to these three series of bonds, Winstar also issued a series of 12¾% Euro-denominated bonds due April 2010.  Lead Plaintiffs do not seek to include purchasers of these Euro-denominated bonds in their proposed class.  (Pl. Reply at 29, n. 29 ("Plaintiffs do not seek class certification of certain Euro-denominated bonds maturing in April 2010")).

[4] Securities issued pursuant to Rule 144A are not publically registered and may only be traded amongst Qualified Institutional Buyers (QIBs), defined as institutional investors with over $100 million in fixed income investments.  17 C.F.R. § 230.144A.

[5] The 12½% bonds and the 14¾% bonds were publically registered on October 13, 2000.  The 12¾% bonds were publically registered on November 6, 2000.

Rule 23(a) has four threshold requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"), (2) commonality ("there are questions of law or fact common to the class"), (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"), and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). Once the Plaintiff has demonstrated that its proposed class meets these four requirements, this Court must determine whether the action can be maintained under one of the three subsections of Rule 23(b). Fed. R. Civ. P. 23(b). Here, Plaintiffs argue that class certification is appropriate under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id.; Pl. Mem. at 18.

Rule 23(a): Numerosity and Commonality

Numerosity is presumed when a class consists of forty or more plaintiffs. Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." In re Bank of Am. Corp. Secs. Litig., 281 F.R.D. 134, 138 (S.D.N.Y. 2012). The exact number of class members need not be known, so long as the contours of the class are ascertainable by reference to objective criteria.[6] Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

---

[6] Although it does not appear in the statute, Courts have read this implicit "ascertainability" requirement into Rule 23(a). See, e.g., In re Bank of Am. Corp. Secs, 281 F.R.D. at 140, In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 395 (S.D.N.Y. 2008); In re Wachovia Equity Secs. Litig., No. 08 Civ. 6171, 2012 U.S. Dist. LEXIS 97910 at *6 (S.D.N.Y. June 12, 2012). This is easily met in the context of securities litigation where the list of shareholders is readily obtainable.

Lead Plaintiffs have satisfied the numerosity requirement by demonstrating that there were over 85 million shares of Winstar common stock traded on the NASDAQ exchange and approximately 610 shareholders of record as of December 31, 1999 (representing approximately 26,000 beneficial shareholders).  Preston Report, ¶ 17.  There were also over $1.88 billion in Winstar bonds outstanding during the class period.  Hakemi Decl., ECF No. 188, Supplemental Report of Candace L. Preston ("CLPB") ¶ 3.  Whether a prospective class member purchased Winstar common shares or bonds during the class period can be objectively determined by examination of brokerage or trading statements.  Lead Plaintiffs have satisfied the numerosity requirement.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  Wal-Mart, 131 S. Ct. at 2551.  In general, "where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied."  Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 180 (S.D.N.Y. 2005).  Here, Lead Plaintiffs claim that the same misstatement and the same irregular accounting practices caused injury to all shareholders and bondholders by artificially inflating the price of Winstar's securities.  Such a common course of conduct routinely satisfies the commonality requirement.  See, e.g., Anwar v. Fairfield Greenwich, No. 09 Civ. 118, 2013 U.S. Dist. LEXIS 26088, at *28 (S.D.N.Y. Feb. 22, 2013); City of Livonia Employees' Ret. Sys. v. Wyeth, 284 F.R.D. 173, 175 (S.D.N.Y. 2012); In re IndyMac Mortgage-Backed Sec. Litig., 286 F.R.D. 226, 233 (S.D.N.Y. 2012).


Rule 23(a): Typicality and Adequacy

To demonstrate typicality, Lead Plaintiffs "must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the

defendant's liability." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009).

Lead Plaintiffs' claims must "arise from the same practice or course of conduct that gives rise to the

claims of the proposed class members." In re Vivendi Universal, S.A., 242 F.R.D. 76, 85 (S.D.N.Y.

2007) (citing Marisol A. v. Giuliani, 929 F. Supp. 662, 691 (S.D.N.Y. 1996), aff'd 126 F.3d 372 (2d

Cir. 1997)).  Defendants can show that a plaintiff's claim is not typical if that plaintiff is subject to

unique defenses that threaten to become the focus of the litigation.[7]  Livonia, 284 F.R.D. at 178;

Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d. Cir. 2000).  In securities

cases alleging dissemination of allegedly false or misleading statements, the nature of the common

injury generally satisfy typicality.  Vivendi, 242 F.R.D. at 85.

Defendant argues that BIM is not typical because its claims are subject to two unique

defenses.[8]  First, Defendant claims that BIM, as a mutual fund manager, suffered no actual loss

because it only purchased shares of Winstar for its mutual funds.  Def. opp'n at 14.  Any actual loss

was suffered not by BIM, but by the investors in BIM's mutual funds.  Defendants argue that

because BIM suffered no injury-in-fact, it does not have standing and therefore cannot serve as lead

plaintiff.

Article III standing consists of three "irreducible" elements: injury-in-fact, traceability, and

redressability.  W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106-07

(2d Cir. 2008).  "[T]he minimum requirement for an injury-in-fact is that the plaintiff have legal

---

[7] The issue of unique defenses does not always fit neatly into any one requirement of Rule 23. Courts have considered such an argument under several different prongs. See e.g., In re Flag Telecom Holdings, Ltd., 245 F.R.D. at 163 n. 18 (defendants unique defense argument relevant to both typicality and adequacy requirements); Rocco v. Nam Tai Elec., Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (same); Koppel v. 4987 Corp., 191 F.R.D. 360, 365 n.8 (S.D.N.Y. 2000) (analyzing unique defenses under the commonality, typicality and adequacy requirements).

[8] Even if BIM was subject to these two unique defenses, DRYE and Ahearn would still be able to serve as lead plaintiffs and class certification would be proper.  Defendant does not assert that DRYE and Ahearn are subject to any unique defenses.

title to, or a proprietary interest in, the claim." Id. at 108. "The fact that plaintiffs are not the beneficial owners of the securities does not necessarily mean that they lack standing to bring their claims." In re Vivendi Universal, S.A., 605 F. Supp. 2d 570, 575 (S.D.N.Y. 2009). Huff recognized a limited exception to the traditional standing requirement, whereby third parties who are not the beneficial owners of a security may bring claims on behalf of the beneficial owners if they can demonstrate "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." Huff, 549 F.3d at 109.

BIM has standing by virtue of Huff's third party exception. Managers of foreign investment funds that are similar in structure to U.S. mutual funds have standing to sue for losses incurred by those funds. Vivendi, 605 F. Supp. 2d at 579. The relationship between mutual fund manager and the mutual fund (which owns the shares) is the requisite type of close relationship, akin to that of trustee and beneficiary. Id. The investors in the mutual funds never purchased or sold shares of Winstar, and thus could not themselves bring suit. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). BIM is the only party who can bring suit for the losses sustained in its mutual funds, and it has standing under Huff to do so. BIM is not subject to this unique defense.

Second, Defendant claims that BIM relied on information it received privately at an investor "road show," not information that was disseminated to the market at large. Def. opp'n at 15. If Defendant can demonstrate that BIM purchased Winstar securities "without relying on the integrity of the market," then Defendant can rebut the presumption of reliance, and BIM's claims would be atypical. Basic, 485 U.S. at 249.

Defendant has not rebutted this presumption. The representations made by Winstar's CEO at the conference are not the basis for liability in the complaint. See In re Refco, Inc. Secs. Litig., 503 F.Supp.2d 611, 642 (S.D.N.Y. 2007) (dismissing claims where statements made at road show

8

were not asserted as a basis for liability in the complaint).  The road show that BIM's senior fund

manager Paolo Boretto attended was related to the sale of Winstar's Euro-denominated bonds,

which are not the subject of this litigation.  Further, Defendant does not allege that Boretto received

any non-public information.  Had BIM traded on the basis of information that was available to it but

not the rest of the market, then Defendant might succeed in demonstrating that this individual issue

would overwhelm the common issues at trial.  See In re Pfizer Secs. Litig., 282 F.R.D. 38, 44

(S.D.N.Y. 2012) (noting that a lead plaintiff who is subject to a defense of non-reliance on the

market may fail the typicality requirement).  But Defendant has not pointed to any information that

Boretto received at the road show that was not in the public domain.

Lead Plaintiffs' claims are typical of the class because they arise out of the same alleged

public misstatement that caused injury to all shareholders and bondholders alike.  Plaintiffs have

met their burden to demonstrate typicality.

Defendants couch these two arguments as a challenge to adequacy as well as typicality.  The

adequacy inquiry is two pronged, considering "whether 1) plaintiff's interests are antagonistic to the

interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and

able to conduct litigation."  Baffa, 222 F.3d at 60.  Lead Plaintiffs have met this requirement.  The

resumes and course of conduct of their attorneys have adequately demonstrated their qualifications,

experience, and competence.  Plaintiffs' attorneys have diligently pursued this case over the past

twelve years, and this Court is satisfied that they will adequately prosecute it at trial.  Defendant has

not identified any interest that would make any named plaintiff antagonistic to the interests of other

members of the class.

Rules 23(b)(3): Predominance and Superiority

Certification of a class pursuant to Rule 23(b)(3), requires Plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b).  Common questions of law or fact predominate when they are issues subject to generalized proof, applicable to the class as a whole, and more substantial than potential individualized issues.  In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001), abrogated on other grounds by, In re IPO, 471 F.3d 24 (2d Cir. 2006).  This requirement is often "readily met in certain cases alleging consumer or securities fraud."  Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997).

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action."  Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184 (2011).  To prevail on their claim that a defendant made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1312 (2011).

In order to prove class reliance in a class action that alleges misrepresentations, Plaintiffs solely rely on the fraud-on-the-market presumption created in Basic Inc. v. Levinson, 485 U.S. 224 (1988).  Reliance is an essential element of a securities fraud action because it "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury."  Halliburton,

10

131 S. Ct. at 2185 (quoting Basic, 485 U.S. at 243, internal quotations marks omitted).  Because

requiring proof of direct reliance by each plaintiff would impose an "unnecessarily unrealistic

evidentiary burden," the Supreme Court allows class plaintiffs to invoke a rebuttable presumption

of "fraud-on-the-market."  Basic, 485 U.S. at 245.  This theory rests on the notion that "certain well

developed markets are efficient processors of public information," and that the market price of

shares reflects all publically available information.  Amgen, 133 S. Ct. at 1192.

      To avail themselves of the fraud-on-the-market presumption, plaintiffs must demonstrate

that (1) the alleged material misstatements were publically known, (2) that the security traded on an

efficient market, and (3) that the plaintiff purchased his shares between the time the misleading

statement was made and the time the truth was revealed.  Halliburton, 131 S. Ct. at 2185.

Defendant contends that Plaintiffs have failed to prove that the market for Winstar's bonds was

efficient throughout the class period.  If Plaintiffs cannot demonstrate that the bond market was

efficient by a preponderance of the evidence, then Plaintiffs cannot avail themselves of the fraud-

on-the-market presumption, and certification of a class that includes bondholders would be

inappropriate.[9]

      An efficient market is one "in which the prices of [securities] incorporate most public

information rapidly."  Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546

F.3d 196, 204 (2d Cir. 2008) (citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier,

Inc., No. 05 Civ. 1898, 2006 U.S. Dist. LEXIS 52991 at *10-12 (S.D.N.Y. Aug. 1 2006)).  The

Second Circuit has "not adopted a test for the market efficiency of stocks or bonds," but has noted

that use of the factors enumerated in Cammer v. Bloom, 711 F. Supp 1264 (D.N.J. 1989), may be

appropriately used as "analytical tool[s]" to guide the efficiency inquiry.  Bombardier, 546 F.3d at

---

[9] Defendant does not contest any of these three elements with respect to the putative shareholder class.

204 n.11, 210.  Because the <u>Cammer</u> factors were created in the context of the stock markets, courts adjust them for the realities of the over the counter bond market.  <u>In re Dynex Capital, Inc. Secs. Litig.</u>, No. 05 Civ. 1897, 2011 U.S. Dist. LEXIS 22484 at *13 (S.D.N.Y. Mar. 7, 2011).  There is no conclusive threshold regarding "how quickly and completely publicly available information" must be reflected in the market's price in order for the market to be considered efficient.  <u>Basic</u>, 485 U.S. at 248 n.28.

The second, third, and fourth <u>Cammer</u> factors all weigh toward the conclusion that the market for Winstar bonds was efficient.  The second <u>Cammer</u> factor that courts look to is the number of securities analysts that follow the company or the security.  711 F. Supp at 1286.  The existence of a number of analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market.  <u>Bombardier</u>, 546 F.3d at 205 (<u>citing Cammer</u>, 711 F. Supp at 1286).  Although courts tend to look at the number of analysts following a given security (as opposed to the company as a whole), in the case at hand, the number of analysts following the company as a whole is instructive. <u>see </u>Michael Hartzmark, Cindy A. Schipani, & H. Nejat Seyhun, <u>Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market</u>, 2011 COLUM. BUS. L. REV. 654, 397 (2011) (noting that "both equity and credit reports provide important and useful information" to bondholders).  The company's overall financial health impacted the price of both Winstar's stock and bonds.  Winstar's bonds carried "junk" ratings which made them highly susceptible to the risk that the company would not be able to repay them.  <u>Cammer</u> dealt with only one class of security (common shares), and did not contemplate how this factor may affect a company who issued both equity and debt.

12

There were at least three analysts who reported directly on the merits of Winstar's bonds during the class period. CLPB ¶ 13. In addition to these bond analysts, there were numerous analysts who followed Winstar's stock and the company itself issued over 35 press releases and was covered by mainstream financial news services such as Bloomberg and the Wall Street Journal. Preston Report, at ¶¶ 20-24. All of these analysts reported on the health of Winstar as a whole, giving both stock and fixed income investors recommendations on securities and opinions regarding the company's outlook. This factor militates toward a finding of market efficiency.[10]

The third factor addresses the number of market makers that deal in the security at issue. Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level. Cammer, 711 F. Supp. at 1287. The SEC defines a market maker as a dealer who either (1) regularly publishes bid and offer quotations, (2) furnishes these quotations upon request, and (3) is ready, willing and able to transact in reasonable quantities at quoted prices. 17 C.F.R. § 240.15c3-1(c)(8).

Plaintiff has submitted evidence that there were at least six large, reputable banks that served as market makers for the Winstar bonds at some point during the class period. CLPB ¶ 10. There are trades evidencing the willingness of these brokers to make markets and several of them publically stated that they made markets in Winstar bonds. See Pls.' Reply Mem. at 37. Courts have held that there need only be "some market makers" that existed to satisfy this factor. Dynex,

---

[10] Plaintiffs also argue that the fact that Winstar bonds were rated by all three major rating agencies (Moody's, Standard & Poor's, and Fitch) is an indicator of efficiency. This is more properly characterized as an indicator that Winstar's management wanted the bonds to trade efficiently, not that they actually did. In the fixed income markets, the issuer pays the rating agencies to rate its bonds. The fact that Winstar's bonds were rated by these three agencies is not indicative of the actual level of investor interest, rather it is a sign that management desired investor interest. Bonds that are not rated by these three agencies may militate against market efficiency, but having all three ratings is not a strong indicator that the market was efficient. See AIG, 265 F.R.D. at 177.

13

2011 U.S. Dist. LEXIS at *15 (thirteen market makers sufficient).  This factor weighs toward a finding of market efficiency.

The fourth factor is whether Winstar was eligible to file SEC registration Form S-3. Cammer, 711 F. Supp. at 1287.  To file a Form S-3, a company must have filed SEC reports for twelve consecutive months and possess a $75 million market capitalization level. See 17 C.F.R. § 239.13.  The ability to file this form indicates that the company is easily able to issue new securities. There is no dispute here that Winstar was able to file Form S-3, and did so on four occasions between June and August 2000.  CLPB ¶ 17.

The first and fifth Cammer factors lead to the conclusion that the bond market was only efficient for a limited period, starting around the time that the bonds were publically registered.  The first Cammer factor is the average weekly trading volume of the security.  711 F. Supp. at 1286.  An active market implies strong investor interest in the company and that new information is constantly having an effect on the price of the security.  Id.  Average weekly trading volume of 2% or more of outstanding securities justifies a "strong presumption" of an efficient market for that security.  Id.

There are significant differences between the average weekly trading volume of the bonds during the private placement period (prior to October 13, 2000) and the public issue period, and between the three different debt securities themselves.  During the private placement period only one of the bonds exceeded the 2% Cammer efficiency threshold.  The other two bonds fell well short of the 2% threshold for the period on average, and only exceeded it in a given week a handful of times.  The average weekly number of trades was low as well.  Such depressed trading activity is not indicative of an efficient market.[11]

---

[11] The pertinent trading statistics for the private issue period can be summarized as follows (ASC2, Ex. 3A):

| Bond: | 12¾% | 12½% | 14¼% |
|---|---|---|---|

These average weekly figures changed markedly around the time that the bonds were publically registered.  After registration, the average weekly trading volumes increased between 4.5 and 15 times.  More banks were involved with trading the bonds, there were fewer weeks where the trading volume fell below the 2% threshold, and the number of trades jumped dramatically for all three issues.  This increased activity is far more indicative of an efficient market.[12]

The fifth Cammer factor that courts consider is whether the Plaintiff can demonstrate empirical facts that show "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the [security's] price."  711 F. Supp. at 1287.  Courts have considered this "the most important Cammer factor" because without finding this causal relationship, it is "difficult to presume that the market will integrate the release of material information about a security into its price."  Bombardier, 546 F.3d at 207 (citing In re Xcelera.com Sec. Litig., 430 F.3d 503, 512 (1st Cir. 2005)).  An event study that examines the effect of disclosure of material information on the price of a security has been considered prima facie evidence of the existence of this causal relationship.  Id.  However an event study may be rejected if

| | | | |
|---|---|---|---|
| Average weekly trading volume | 0.3% | 2.9% | 0.6% |
| Number of weeks below the 2% threshold | 27/29 | 15/32 | 26/29 |
| Average weekly number of trades | 1.1 | 11.1 | 8.1 |
| Average number of different banks trading per week | 0.2 | 1.7 | 1.2 |
| Date publically registered | 10/13/00 | 11/6/00 | 10/13/00 |

[12] The pertinent trading statistics for the public period can be summarized as follows (ASC2 Ex. 3B):

| Bond: | 12¾% | 12½% | 14¾% |
|---|---|---|---|
| Average weekly trading volume | 4.5% | 12.9% | 3.0% |
| Number of weeks below the 2% threshold | 9/25 | 1/22 | 11/25 |
| Average weekly number of trades | 12.8 | 81.6 | 31.7 |
| Average number of different banks trading per week | 1.9 | 4.3 | 2.2 |

15

it is methodologically unsound or unreliable.  Id. n.15 (citing Bell v. Ascendant Solutions, Inc., 422

F.3d 307, 316 (5th Cir. 2005)).

Plaintiff's expert, Candice L. Preston, was unable to complete a formal event study for

Winstar's bonds because she did not have trading data for each day of the class period.  CLPB ¶ 18.

Instead, she selected five days[13] on which news was released that she thought might be material,

and qualitatively analyzed the change in the price of Winstar bonds relative to the price change of

the Lehman U.S. Bond Composite Index (a market-wide bond index composed of investment grade

government, agency, corporate and mortgage-backed bonds).  Hakemi Decl., Supplemental

Affidavit of Andrew S. Carron ("ASC2"), ¶ 21.  Based on this analysis, she opined that Winstar

bonds "responded to corporate events and other information about the financial condition of the

Company when it entered the market."  CLPB ¶ 25.

Although Preston's study has several shortcomings,[14] her evidence shows that the price of

Winstar's bonds reacted to news about the company on two days during the class period.  Her

evidence demonstrates that Winstar's bonds rose appreciably on November 8, 2000, after Winstar

announced that a group of outside investors agreed to invest one billion dollars in Winstar to

---

[13] Preston does not explain why she selected these dates and did not opine on other dates when the price of Winstar
bonds moved.  Only searching for dates with news and large price drops is not a highly scientific form of analysis.  In re
PolyMedica Corp. Secs. Litig., 453 F. Supp. 2d 260, 270 (D. Mass. 2006).  Preston did not seek to explain large price
movements in Winstar bonds on days where no new information came out, such as November 29 and 30, 2000.  ASC2 ¶
20.

[14] Three of the dates that Preston chose are problematic: the first (March 24, 2000) was prior to the date that the bonds
were issued, and the fourth (April 5, 2001) and fifth (April 16, 2001) were after the end of the class period.  Preston was
not able to perform a traditional event study because she did not have sufficient trading data and was unable to
supplement the data she had with data from pricing services.  She did not report whether the price movements she
observed were statistically significant.  Finally, her use of the Lehman Index (an investment grade bond index) as a
point of comparison for the movement in Winstar's high yield bonds provides an inaccurate and misleading portrait for
how the price of Winstar's bonds moved relative to the relevant market.

finance its operations into 2002. CLPB ¶ 21.[15]  Second, she cites a Bloomberg news article from March 21, 2001, which indicated that the price of Winstar bonds had recently declined in price due to new information in the market concerning the health of the company.  This too supports the inference that the market price was changing at that time in reaction to news about the financial health of the company.

This factor supports a finding that the market was efficient, although only after October 2000.  While her study did not consider whether the observed price movement was statistically significant and only addressed two relevant dates, the evidence that she provided indicates that the price of Winstar's bonds did move in relation to news that impacted the company's financial health on those occasions.  By contrast, Preston did not identify a single date during the private issue period when Winstar's bonds reacted to new information about the company.  Therefore, like the first factor, this one only supports a finding that the market for Winstar bonds was efficient after the private placement period.

The Cammer factors, especially in the context of the bond market, are merely an analytical guide and are not exhaustive.  Bombardier, 546 F.3d at 210.  Another factor that Plaintiff's expert described in passing that impacts the liquidity, and, in turn, the efficiency of the market for Winstar bonds is the par value of the total amount of bonds outstanding.  In re HealthSouth Corp. Secs. Litig., 261 F.R.D. 616, 632 (N.D. Ala. 2009).  A larger amount of par value outstanding indicates that the bonds' underwriters were able to find investors willing to initially purchase a large amount of debt which demonstrates a greater amount of investor interest.  Further, it is prima facie evidence of a more liquid market, because the more units of a security that are available to trade, the more

---

[15] Although Preston did not have pricing data for the immediately previous day for one of the securities, this in itself is not fatal to her analysis given the realities of the high yield bond market. Dynex, 2011 U.S. Dist. LEXIS 22484 at *19.

17

likely that a potential buyer or seller is to find a counterparty willing to transact.  See Krogman v.

Sterritt, 202 F.R.D. 467, 478 (N.D. Tex. 2001); see generally Hartzmark, Fraud on the Market,

supra, at 664.

The total par value of all three Winstar bonds was $1.88 billion.  Preston opined that a

"financing of this size" is likely to be efficient.  Hakemi Decl., Ex. H, Preston Deposition, at 66.

Courts that have examined bond market efficiency tend to find that smaller issues of bonds did not

trade in efficient markets, while larger issue sizes did.  Compare In re Safety-Kleen Corp.

Bondholder Litig., No. 00 Civ. 1145-17, 2004 U.S. Dist. LEXIS 31009 at *5-6 (D.S.C. Oct. 29,

2004) (issue size of $550 million was ultimately found to not trade in an efficient market) with In re

Enron Corp. Secs. Litig., 529 F. Supp. 2d 644, 756-57 (S.D. Tex. 2006) ($3.3 billion par value

traded in efficient market); HealthSouth, 261 F.R.D. at 637 ("The large market value [$3.5 billion]

of the HealthSouth Bonds [sic.] reflects trading in an efficient market.").  The sufficiently large

issue size here is consistent with a more liquid and efficient market.[16]

Plaintiffs have only demonstrated that the market for Winstar bonds was efficient after

October 16, 2000.[17]  Prior to this date, the bonds were not publically registered and could only be

purchased by QIBs.  Average weekly trading—in terms of number of trades, number of banks

trading each bond, and volume of trades—was much lower while the bonds were privately

---

[16] The parties' experts did not opine in any meaningful way on any additional factors that may have been useful to the court, including the bid-ask spread (In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Secs., 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (citing Krogman v. Sterritt, 202 F.R.D. 467, 478 (N.D. Tex. 2001) ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the [security] is too expensive to trade")) or whether there were a substantial number of institutional investors who purchased the security (In re Enron Corp. Secs. Litig., 529 F. Supp. 2d 644, 756 (S.D. Tex. 2006) (noting that a "substantial number of institutional investors" is consistent with market efficiency)).

[17] This is the first trading day after the 12½% and 14¼% bonds were publically registered.  Although the 12¾% bonds were not publically registered until November 6, 2000, they were consistently the most liquid issue, and exhibited a significant volume of trading around the time that the other issues became publically registered.  See ASC2 Exs. 3A-3C.

registered.  Although there were ostensibly six market makers in the Winstar bonds, during any given weekly period, an average of fewer than two banks actually completed any transactions. Importantly, Plaintiffs have supplied no evidence that the price of the high yield bonds at issue reacted to news about the company during this private placement period.

Plaintiffs are only entitled to the presumption of reliance for bond purchases made on or after October 16, 2000.  Once the bonds were publically registered, the universe of available buyers expanded.  The actual trading data shows a marked increase in the number and volume of trades, and number of market makers actually involved in trading the bonds.  There are several dates during this period when the price of Winstar's bonds responded to news about the company.  Together with the other factors, this is sufficient to demonstrate a finding of market efficiency for this period.[18]

Plaintiffs have also satisfied the superiority requirement of Rule 23(b)(3).  In passing, Defendant claims that the presence of the Jefferson Plaintiffs, a small group of institutional investors who opted out of the class, indicates that other investors will likely opt out and that class adjudication is not superior to individual adjudication.  Def. Opp'n at 40.  Plaintiffs respond by pointing out that they mailed 150,000 notices in connection with earlier settlements with other defendants in this litigation and that only five investors opted out.  Pl. Reply at 23.  This does not

---

[18] Even though the contours of the stockholder and bondholder class periods are different, class litigation is still a superior method for adjudicating Plaintiff's claims.  The class periods are not in tension with one another and will be subject to the same proof at trial.  See Chan v. Orthologic Corp., No 96 Civ. 1514, 1996 U.S. Dist. LEXIS 22385 at *9-10 (D. Az. Dec, 19, 1996) (small divergence in class period insufficient to defeat certification where the claims in both periods would be subject to similar proof); see also In re Charles Schwab Corp. Sec. Litig., 264 F.R.D. 531, 540 (N.D. Cal. 2009) (certifying several classes with different class period starting dates).  The only issue that dividing up the class periods creates revolves around the set of persons or entities that will be able to recover damages, should Plaintiffs be able to demonstrate that they are so entitled.  This is an issue that has, and would always exist, as different named and absent plaintiffs have purchased and sold different securities at different times within the class period, and the bonds were not issued for several weeks after the class period started.  Differences in individual damages calculation are insufficient to defeat certification in a securities class action.  Seijas v. Republic of Arg., 606 F.3d 53, 58 (2d Cir. 2010); McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 231 (2d Cir. 2008).

indicate a probability that a significant number of absent plaintiffs will opt out in the future. Plaintiffs have demonstrated superiority.

### Lead Plaintiffs Have Standing to Assert Claims on Behalf of Bond Purchasers

Defendant's supplemental brief argues that no Plaintiff has standing to bring claims on behalf of bond purchasers because no Lead Plaintiff actually purchased any of these bonds.[19]  Def. supp., ECF No. 265, at 1.  Historically, district courts in this Circuit were split on whether a named plaintiff can assert claims on behalf of purchasers of a security that no named plaintiff has purchased.  Compare Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530 (S.D.N.Y. 2008) (finding that plaintiffs lacked standing to sue on behalf of shareholders of funds in which plaintiffs did not invest); In re Smith Barney Transfer Agent Litig., 765 F. Supp. 2d 391, 399 (S.D.N.Y. 2011); In re Salomon Analyst Level 3 Litig., 350 F. Supp.2d 477, 497 (S.D.N.Y. 2004); with AIG, 265 F.R.D. at 165-67 (granting standing to purchasers of ordinary shares to represent purchasers of bonds that no named plaintiff bought).  When the injury suffered by absent security holders was based on a legal theory or course of conduct apart from the injury suffered by named plaintiffs, courts typically did not permit lead plaintiffs to represent the absent security holders.  Conversely, courts found standing when claims were brought under the same legal theory and alleged a course of conduct that injured both types of security holders in a similar manner.  See, e.g. AIG, 265 F.R.D. at 167.

The Second Circuit has recently clarified the ability of purchasers of one type of security to represent purchasers of other types of securities that no named plaintiff purchased.  NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co. concerned class standing in the context of

---

[19] Lead Plaintiffs do not dispute that the only Winstar bonds that any of the three of them purchased were the Euro-denominated bonds due April 2010.

purchases of tranches of 17 mortgage-backed securities ("MBS") trusts.  693 F.3d 145 (2d Cir.

2012) cert. denied 2013 U.S. LEXIS 2314 (Mar. 18, 2013).  All 17 trusts shared the same shelf

registration statement that the named plaintiffs alleged contained material misrepresentations,

although each individual trust was issued pursuant to its own unique prospectus supplement.[20]

Named plaintiffs had purchased tranches from two different trusts but sought to represent a class of

purchasers of all tranches from all 17 trusts.

In holding that the named plaintiffs could represent purchasers of securities that no named

plaintiff had bought, the Second Circuit promulgated the following test for class standing:

> [I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1)
> that he personally had suffered some actual... injury as a result of the putatively
> illegal conduct of the defendant,... and (2) that such conduct implicates the same set
> of concerns as the conduct alleged to have caused injury to other members of the
> putative class by the same defendants."

Id. at 162 (internal quotations and citations omitted).  It noted that "in the context of claims alleging

injury based on misrepresentations, the misconduct alleged will almost always be the same: the

making of a false or misleading statement."  Id.  But whether that conduct "implicates the same set

of concerns for distinct sets of plaintiffs" will depend "on the nature and content of the specific

misrepresentations alleged."

Here, named plaintiff shareholders have standing to assert claims on behalf of bondholders

because they meet both prongs of the Second Circuit's test.  There is no question that named

plaintiffs meet the first prong because they have plausibly alleged that they suffered some actual

injury as a result of the Defendant's conduct.  Each of them purchased common shares during the

---

[20] The shelf registration feature permits certain qualified issuers to offer several securities by first filing a shelf
registration statement and then filing separate prospectus supplements for each offering. 17 C.F.R. § 230.415; NECA,
693 F.3d at 150. The shelf registration contains certain core information about the securities in general. Id. Each
prospectus supplement contains additional information that is unique to a given security. Id. Each MBS trust is
registered pursuant to both the uniform shelf registration statement and the unique prospectus supplement. Id. at 151.

class period that they held through its end.  They allege that these shares declined in price as a direct result of Defendant's public misrepresentations.  They therefore meet the "injury in fact" requirement of Article III standing (see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, (1992)), and the first prong of the Second Circuit's test.

The injury suffered by Plaintiffs here also implicates the "same set of concerns" as the injury suffered by purchasers of Winstar's bonds.  Although NECA itself concerned MBS,[21] the Circuit specifically extended its holding to cover a "series of corporate debt offerings, issued over the course of a year, all of which contained an identical misrepresentation about the issuing company's impending insolvency." NECA, 693 F.3d at 163.  It opined that "claims brought by a purchaser of debt from one offering would raise a 'set of concerns' nearly identical to that of a purchaser from another offering: the misrepresentation would infect the debt issued from every offering in like manner, given that all of it is backed by the same company whose solvency has been called into question." Id. (emphasis added).  A scenario in which "debt backed by a single company through offering documents tainted by a single misstatement about that company" raises the "same set of concerns." Id.

The case at hand is substantially similar.  The misstatement at issue here (the unqualified audit letter in Winstar's Form 10-k) related to a single company (Winstar), and was not security-specific.  The public filing concerned the financial health of Winstar itself, which in turn relayed

---

[21] To date, courts in this Circuit have only had the opportunity to apply NECA in the context of MBS litigation.  See Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., NA, No. 12 Civ. 2865, 2012 U.S. Dist. LEXIS 173871 (S.D.N.Y. Dec. 7, 2012) (finding that plaintiffs had class standing "to pursue claims on behalf of purchasers in tranches other than those in which they invested"); N.J. Carpenters Health Fund v. Residential Capital, LLC, 2013 U.S. Dist. LEXIS 1514 (S.D.N.Y. Jan. 3, 2013) (delaying ruling on class standing until after the Supreme Court ruled on the petition for certiorari that NECA appellees filed); In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09 Civ. 2137, 2013 U.S. Dist. LEXIS 5285 at *10 (S.D.N.Y. Jan. 11, 2013) (granting a motion for reconsideration that recognized that plaintiffs had standing to assert claims on behalf of MBS offerings they did not purchase); N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653, 2013 U.S. Dist. LEXIS 12640 at *11 (S.D.N.Y. Jan. 23, 2013) (granting motion for reconsideration in wake of NECA).

material information to owners and potential purchasers of Winstar's stocks and bonds trading in efficient markets. This action does not concern identical language inserted into multiple documents as was the case in NECA; here, the misstatement was in a document that was broadcast at the same time to all members of the public, prospective shareholders and prospective bondholders alike. Whether Defendant's participation in issuing this alleged misstatement injured purchasers of Winstar securities is a question that implicates the same set of concerns for all investors in Winstar's securities, including stocks and bonds, because of their common concern for the company's financial health. As Plaintiffs have met both prongs of NECA, they have class standing to represent both stock and bond purchasers.

### Conclusion

Plaintiffs' Motion for Class Certification (ECF No. 140) is GRANTED to the extent that this Court hereby certifies a class with the following sub-class definitions:

I.   All persons and entities that purchased the common stock of Winstar from March 10, 2000 until April 2, 2001 (inclusive) and were damaged thereby;

II.  All persons and entities that purchased Winstar U.S. dollar-denominated 12½% bonds due April 2008 (CUSIP 975515BD8), 12¾% bonds due April 2010 (CUSIP 975515AY3), and 14¼% bonds due April 2010 (CUSIP 975515AZ0) from October 16, 2000 until April 2, 2001 (inclusive) and were damaged thereby.

The certified class is led by Lead Plaintiffs BIM, Ahearn, and DRYE.


Dated: New York, New York
     April 17, 2013

SO ORDERED:

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge

23

APR 17 2013